510 So.2d 33 (1987)
John HARDIN, et al., Appellants,
v.
MUNCHIES FOOD STORE, et al., Appellees.
No. 18742-CA.
Court of Appeal of Louisiana, Second Circuit.
June 10, 1987.
Joseph W. Greenwald, Shreveport, for appellants.
Bodenheimer, Jones, Klotz & Simmons by Harry D. Simmons, Shreveport, for appellees.
Before MARVIN, FRED W. JONES, Jr., and NORRIS, JJ.
*34 NORRIS, Judge.
Plaintiff Judy Tabor appeals a judgment that dismissed her suit for personal injuries, fright and mental distress arising from an aggravated assault on the defendants' premises. Tabor and her boyfriend, John Hardin, had stopped at defendants' convenience store early one morning when they were attacked by an assailant. Hardin was severely beaten while Tabor, who was safely inside their truck most of the time, sustained an injury to her jaw, allegedly as a result of the attack. The case was tried before a jury which rendered verdicts in favor of both plaintiffs and against the insurer, Safeco. Hardin's award was satisfied but Tabor's verdict was met with a motion for judgment n.o.v., a remittitur or a new trial. The trial judge granted the judgment n.o.v. and Tabor has appealed. For the reasons expressed, we reverse and remand.

JUDGMENT NOTWITHSTANDING THE VERDICT
The trial court's decision to enter a judgment n.o.v. requires us to review the evidence under a standard different from that usually applied in a civil appeal. A judgment n.o.v., authorized by LSA-C.C.P. art. 1811,[1] is a procedural device whereby the trial judge may correct a legally erroneous verdict. The judge is empowered, if the proper standard is met, to reapportion the fault and amend the amount of damages assessed by the jury. See Price v. La. Farm Bureau, 457 So.2d 722 (La.App. 2d Cir.1984), writs denied 462 So.2d 205, 206 (La.1985). A judgment n.o.v. should be granted only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the movant. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.1985), writ denied 476 So.2d 353 (La.1985); Boeing v. Shipman, 411 F.2d 365 (5th Cir. 1969). We must therefore review the facts to determine whether they are so insufficient to support the jury's verdict that reasonable men could not have differed as to liability. See LSA-C.C.P. art. 1811, Official Revision Comment. The party against whom a motion for judgment n.o.v. is made must be given the benefit of every legitimate and reasonable inference that can be drawn from the evidence by the jury. Rougeau v. Comm'l Union Ins. Co., 432 So.2d 1162, 1167 (La.App. 3d Cir.1983), writ denied 437 So.2d 1149 (La.1983).

FACTS
Judy Tabor was driving home with John Hardin in John's pickup truck around 1:30 on the morning of May 10, 1984. John was a salesman who dealt in storm windows and doors. Earlier in the evening he and Judy had gone to the Key Note Lounge to meet with a customer, the proprietor of the lounge, who had previously bought windows from John and wanted to discuss a minor complaint about the product. The customer was not there, but John and Judy decided to stay for a while, during which time John got somewhat intoxicated. Judy could not estimate how long they stayed there, but when they decided to leave Judy drove the truck. Halfway home they realized they were out of cigarettes and would have to stop somewhere for more. They spotted a 7-11, but it was closed, the time being after midnight. A few blocks down, on the corner of 70th and Line, they saw Munchies Food Store. Neither of them had ever been to Munchies before, but the place was well lit and obviously open; Judy *35 pulled in and parked the truck directly in front of the front door. John went inside for the cigarettes and Judy waited outside in the truck.
After John went inside, a large black man who had been standing by the front door of Munchies walked up to the truck and began speaking to Judy through her partly open window. This man was Oliver King, the assailant, and neither Judy nor John knew him. His remarks to her were sexual, crude and offensive; she patiently sat in the truck, trying to ignore him. Presently John walked out of the store and saw King standing by his truck. Instead of going to the passenger door and getting in, he walked to the driver's side and addressed King, telling him to leave Judy alone. They exchanged some words.
What happened next was observed, at least in part, by several witnesses who were in Munchies at the time. The cashier, Jerry Green, was working behind the counter. Another employee, Herbert Coleman, was not on duty but had come to the store to play some Pac Man.[2] A customer, Tommy Johnson, was also present. He was assistant manager at the nearby Church's Fried Chicken and usually stopped at Munchies on his way home every evening for a snack.
The length of the argument was somewhat disputed at trial. Judy's estimates ranged from less than a minute, R.p. 169, to two or three minutes, R.p. 469. Johnson, who watched the whole incident, placed the time at two to three minutes, R.p. 332. We have recognized that a witness's perception of time in an emergency situation is inaccurate. See Smiciklas v. Groendyke Transport, Inc., 505 So.2d 775 (La.App. 2d Cir.1987). We feel that the testimony of Johnson, as an uninvolved witness, is credible and is not contrary to Judy's recollection of events; the jury was entitled to conclude that the argument lasted two to three minutes.
According to Judy, when the argument finally ended, the last thing King said to John was, "There isn't going to be any trouble." He suddenly pulled a heavy pipe out of his back pocket and hit John in the head. He fell to the ground with blood streaming from his nose and mouth.
Until this time, Judy had remained in the truck. When John hit the concrete she hopped out and ran over to him hoping to help, but King brandished a butcher knife and threatened to "cut her open." She hurried back into the truck and slammed the door. King went to the door and flailed his knife through the partly open window. Judy scrambled to the floor of the truck and did her best to stay out of the knife's reach. At some point in this initial phase she hit her cheek against the rear view mirror. She was screaming with terror throughout. King returned to John, who was lying senseless on the pavement, and inflicted a savage beating. Judy opened the passenger door, leaned out and began screaming for help. She saw two people standing in front of the store, watching and within earshot. One of these onlookers was dressed in a Munchies T-shirt, the other in a plain T-shirt; both were black. Neither of them acted; both stood by and stared. The one in the Munchies shirt actually threw up his hands and shouted an obscenity in response to Judy's cries for help. Realizing there was to be no help from these onlookers, Judy got back into the driver's seat and placed the truck in reverse, intending to run over King. King, however, crouched over John, flashed the knife and threatened to cut him open if she moved an inch. He grabbed John by the collar and pounded his head against the pavement. The onlooker in the Munchies shirt shouted to King, "You gonna kill the man." Judy kept screaming for help and honking the horn. King returned to the truck, hollered at Judy and beat on the windshield with his fist. Finally the man in the Munchies shirt shouted to King, "You're gonna have to book." Walking back to John, King rolled him over and stole his wallet, gold chain and cigarettes. *36 He fled on foot; the police were on the scene within two minutes. The entire incident lasted, in Judy's estimation, 20 to 25 minutes.
John Hardin could not testify about the events of the attack. Among his numerous other injuries, he suffered from amnesia.
Tommy Johnson, the Munchies patron who had just walked over from Church's Fried Chicken, testified that he first noticed King when he heard the loud talking outside. He said he never took chances with his store; he always called the police when there was trouble. Realizing something was bound to happen, he immediately told the cashier to call the police. The cashier, however, replied that it would be over before the police could arrive. Johnson said he did not know King but he seemed slightly familiar; perhaps he had been in Church's before. The entire incident was in plain view through the front door. The cashier was standing by and could see it all very easily, according to Johnson. King hit John in the stomach with a pipe, and when John bent over, King grabbed him by the hair and dragged him to the curb by the front door of the store. He then knocked John's head against the concrete and kicked him a few times, hollering at him between kicks. Johnson testified that Judy got out of the truck, went to the front of the store and shouted for help, but he was too scared to intervene. He saw Judy run over to King and hit him across the back, but King chased her back to the truck. He saw her lunge over to one side. Twelve or thirteen minutes into the attack, he again told the Munchies employees to call the police, but they replied that the fight was almost over. The employees walked outside and told King, "You done beat the man." King did not stop. Later they told him they were going to call the police; King still did not stop. Finally, a few minutes later, they told him they had in fact called the police; this is when King grabbed John's wallet and fled. The whole incident lasted, in Johnson's estimation, 18 to 20 minutes.
Herbert Coleman testified that he came to the store that night to play Pac Man. He chatted with Johnson, whom he knew, before going into the games area. He asked Green, the cashier, for change. He was playing for about 15 minutes when he first heard the racket. He claims he instantly came to the front of the store, saw what was happening and called the police.
The cashier, Jerry Green, also took the stand. He was aware that King was in the store that night; he knew King and knew that he had done time in Angola. He said that King had never caused any disturbance at Munchies, and denied seeing or hearing anything until the fight was well in progress. He admitted that even after he saw the difficulty he did not call the police; he thought, however, that Coleman called as soon as Johnson told him to. Green said there was a procedure for calling the police in certain cases but he had received no special training. He also admitted failing to tell the police who the assailant was, even though he knew. Three days after this incident, he left Munchies' employ, adding that he was scared of King.
Several police officers testified. They clearly established, from the tape recordings of their phone calls, that an officer was at the scene three minutes and 18 seconds after Coleman placed the call. Corporal Jones was stationed about a block and a half away during the entire incident and could have responded in an instant as soon as someone called. Corporal Johnson also testified that he was nearby. He said the police received many calls from that area and several from the Munchies store in particular, although the latter were generally for shoplifting. Corporal Jones added that Munchies was in a "high crime area." R.p. 370.
Oliver King was apprehended later that night at his sister's house, one block from Munchies. He was charged with attempted second degree murder and armed robbery. He is now serving 75 years at Angola and did not testify in this trial.
Judy's physical injury consisted of an anterior disc displacement of the temporal mandibular joint (TMJ). Her dentist, Dr. Gamble, first examined her on June 1, three weeks after the incident. She was *37 complaining of pain chiefly in the left jaw but both joints were popping and clicking. She reported to him that her jaw had been in some pain three or four months earlier, following a wide and uncomfortable yawn. This pain, however, had subsided by the time of the attack and was never as unbearably severe as it was afterwards. With Dr. Hollembeak, he constructed an appliance to fit between her teeth; she wore this until the end of October, when Dr. Hollembeak found her to have almost no diminution of opening and no audible popping. Dr. Gamble commented that this sort of injury is sometimes called "cheerleader syndrome" and is associated with prolonged shouting, such as Judy did when calling for help from inside the truck. Dr. Gamble also said that striking a rear view mirror could have aggravated a mild, pre-existing condition. He felt sure that whatever the cause of the current pain, it was an aggravation of a pre-existent condition. Judy also suffered trauma and considerable guilt as a result of the incident.
The jury returned a verdict in favor of both plaintiffs and against the insurer.[3] John's verdict was for $167,066.52; Judy's was for $55,141.05. Urging the verdicts were excessive, Safeco moved for a remittitur or new trial; it also moved for a judgment n.o.v. or a new trial, once again urging excessiveness. Safeco eventually paid off John's portion of the verdict, but maintained its motions with respect to Judy. The trial judge then granted the motion for judgment n.o.v. and dismissed Judy's portion of the suit.
In his written opinion, the trial judge mentioned two strictly legal bases for denying her recovery. First, there is no award of damages for witnessing an injury being inflicted upon a third person. Second, there is no recovery for the obscene and abusive language that King used on Judy. The judge then turned to an issue of law and fact. He felt that the evidence "conclusively" showed that Judy injured her jaw at the very outset of the confrontation. She did this by hitting her jaw on the rear view mirror when she hopped into the truck after her first unsuccessful attempt to render aid to John. The injury was so quick and spontaneous that "even if Munchies employees had responded by calling the police within a reasonable period of time of receiving knowledge of the events going on outside the store, Tabor would have received these injuries." Thus the dislocated jaw would have occurred even if Munchies had fully discharged its duty of care to its patrons. The judge then noted that most of Judy's TMJ problem was pre-existent and that the proposed medical procedures were aimed in part at correcting the prior damage. His ruling on the judgment n.o.v., however, was not based on the excessiveness of the award but on the fact that the injury did not result from any fault on the part of the Munchies employees. This is the only issue before us on appeal.

LIABILITY
We recently analyzed the duty of an convenience store owner to its customers in Ballew v. Southland Corp., 482 So.2d 890 (La.App. 2d Cir.1986). A business establishment such as a Southland 7-11 store, or Munchies, owes a duty of reasonable care to protect its patrons from injury. This duty does not extend to unforeseeable or unanticipated criminal acts by independent third persons. The duty arises when the owner, management or employees of the business have or should have knowledge of a third person's intended injurious conduct that is about to occur and is within the power of the owner, management or employees to protect against. Ballew v. Southland Corp., supra; and citations therein. When the independent, intentional, tortious or criminal acts of third persons constitute an unreasonable risk of harm, the duty can be discharged by summoning the police at the time the proprietor knows or should reasonably anticipate that the third person poses a probable danger. Rodriguez v. *38 NOPSI, 400 So.2d 884 (La.1981); Ballew v. Southland Corp., supra.
The questions of whether the store clerk had or should have had knowledge of the potential injurious conduct and whether it was within his power to protect against are factual matters. We have reviewed the evidence under the standard for granting a judgment n.o.v. and note four salient facts that completely undermine the judgment and reinforce the jury's verdict of liability.
First, the witness Tommy Johnson unequivocally advised the cashier, Jerry Green, to call the police at the beginning of the argument. R.p. 308, 310. With this request came warning of a potentially dangerous situation, even if Green could not anticipate the specific form of damage that was impending. We need not speculate on whether Oliver King displayed to Munchies' employees the "suspicious actions and erratic behavior" we found in Ballew, supra, because the cashier knew King's reputation and had a specific warning from an onlooker. Most importantly, the cashier's actual knowledge of a potential danger may be inferred from his response that it would be over before the police arrived. Green obviously suspected trouble. In the recent case of Jones v. Kwik Karol, 490 So.2d 664 (La.App. 2d Cir.1986), we held it error for the trial court not to consider specific requests for help, directed to the cashier at a convenience store. In that case, we imposed liability for an assault on the parking lot of a convenience store whose cashier refused to honor requests that he call the police. The situation in the instant case is similar. There was a clear request and an insouciant reply. The cashier knew of the potentially dangerous situation well in advance of the first blow.
Second, law enforcement officers were in the area and could have responded in a remarkably short time. When Coleman, the off-duty Munchies employee, finally called, the first officer arrived less than three minutes after Coleman hung up the phone; the second officer came thirty seconds after the first. The record establishes a time frame: John Hardin exits the store and begins arguing with Oliver King; Johnson senses imminent danger and tells the cashier to call the police, but he refuses; Hardin and King continue arguing for two or three minutes, whereupon King strikes Hardin; Hardin falls to the ground; Judy Tabor sees this and gets out of the truck in an effort to assist Hardin; and King chases her back to the truck with a knife. This is when the trial court felt the injury occurred. The question is perhaps close whether there was a three-minute interval during which the police, if promptly summoned, could have arrived and defused the situation. The jury was certainly entitled to conclude that a prompt call would have prevented the injury. We cannot uphold the trial court's ruling that reasonable men could not reach this factual conclusion based on the evidence adduced.
Third, Oliver King fled as soon as Green specifically told him the police had been called. R.p.p. 315, 316. Even though Green was scared of King and denied any involvement in the incident, it is clear both from Johnson's and from Judy Tabor's testimony that Green's admonition to leave or "book" because the police had been called was what set King on his heels. If Green had done this any time during the verbal confrontation, after he had notice of the problem from Johnson, then King might have left and the entire physical conflict could have been averted. Even after the first blow, Judy Tabor's injury could have been averted. This resolution would have been instant and would not even have required the three-minute response time that calling the police did. The jury was entitled to infer that Green was negligent in not using this procedure sooner in discharge of his duty of reasonable care.
Finally, there is the testimony of Dr. Gamble, who said that the TMJ injury could have resulted from screaming or yelling as well as from striking the mirror. R.p. 420. Dr. Hollembeak did not exclude this possibility. R.p. 242. It would have been reasonable for the jury to conclude that 20 minutes of loud, uncontrollable screaming could have caused the disc displacement. If this was the case, then Munchies personnel could have set King to flight and stopped the great majority of the *39 screaming that aggravated Judy's problem. No action, however, was taken until much later. Quick action could have stopped the screaming and prevented the injury.
These facts show both knowledge and ability to prevent the harm that befell Judy Tabor. We conclude that reasonable and fair-minded jurors, viewing all the evidence in the light most favorable to the plaintiff, Judy Tabor, could have reached different conclusions as to whether or not Munchies employees could have prevented, by the exercise of reasonable care, the injuries that she sustained. Thus the trial judge was in error to grant judgment n.o.v. on the issue of liability. This judgment will be reversed.

RELIEF
Appellant also asks us to review the damages. We conclude, however, that this issue is not before us. After resolving the issue of liability framed by the judgment n.o.v., the next logical step would be to address the question of a new trial. The issue was preserved when Safeco filed its motion for judgment n.o.v. or alternatively a new trial, R.p. 89. There was also a motion for remittitur or alternatively a new trial, R.p. 86. The Code of Civil Procedure contemplates that when a motion for judgment n.o.v. and new trial are filed together, they must both be resolved in the trial court. This is so even if the granting of the judgment n.o.v. would seem to obviate any need to rule on the new trial. LSA-C. C.P. art. 1181C(1) specifically provides:
C. (1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. (emphasis added)
There is no order conditionally granting or denying the motion for a new trial, nor does the judgment appealed from make reference to the alternative motion for a new trial. The judgment should have contained an order granting or denying the alternative motion, so that there would be a statutorily authorized means to proceed in the event of reversal of the judgment n.o.v.
Although the judgment does not mention the disposition of the motion for a new trial, the reasons for judgment state that had the court not granted the motion for judgment n.o.v., it would have ordered a remittitur to $15,000 and if Judy Tabor had refused to consent, a new trial on quantum would have been ordered. As the record now stands, however, there is no order conditionally granting or denying new trial. Appeal or review lies only from the judgment, not the reasons therefor. Wright v. Ocean Drilling and Expl., 461 So.2d 1084 (La.App. 4th Cir.1984); State in the Interest of Mason, 356 So.2d 530 (La. App. 1st Cir.1977). Moreover, there is no appeal from a remittitur as authorized by LSA-C.C.P. art. 2083 since no remittitur has been entered. The issue of quantum is not yet properly before us.
The only matter properly before us is the judgment n.o.v. on the issue of liability. This has been reversed. We therefore remand this matter for further proceedings consistent with this opinion and in accordance with law. Costs of this appeal are assessed against Safeco.
REVERSED AND REMANDED.
NOTES
[1] Art. 1811. Motion for judgment notwithstanding the verdict

A. (1) Not later than seven days, exclusive of legal holidays, after the signing of the judgment, or if notice of the signing of the judgment is required under Article 1913, not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice, a party may move for a judgment notwithstanding the verdict. If a verdict was not returned, a party may move for a judgment notwithstanding the verdict not later than seven days, exclusive of legal holidays, after the jury was discharged.
* * * * * *
F. The motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues.
[2] A third employee, named "Michael," was at the store but was in the back doing stockwork and was not a witness.
[3] Munchies Food Store Partnership was dismissed at the top of Safeco's half of the trial. R.p. 476.