577 So.2d 1172 (1991)
Douglas Ray THOMPSON, Appellant,
v.
Tom HODGE, West Monroe Lodge # 1723, Loyal Order of Moose, and Firemans Fund Insurance Company, Appellee.
No. 22202-CA.
Court of Appeal of Louisiana, Second Circuit.
April 3, 1991.
*1174 Arbour & Aycock by Geary S. Aycock, West Monroe, for Douglas Ray Thompson.
Marshall Blackwell, Monroe, for Tom Hodge.
Theus, Grisham, Davis & Leigh by Sharon W. Ingram, Monroe, for Moose Lodge and Firemans Fund Ins.
Before NORRIS, LINDSAY and BROWN, JJ.
NORRIS, Judge.
Plaintiff, Douglas Ray Thompson, sued defendants, Tom Hodge, West Monroe Lodge # 1723, Loyal Order of Moose, Inc. (the Lodge) and its insurer, Fireman's Fund Insurance Company (FF), for damages sustained in a fist fight with Hodge at the Lodge. West Monroe City Court rendered judgment of $10,000, its jurisdictional limit, against Hodge but absolved the Lodge and FF from liability. Thompson appeals the portion of the judgment denying recovery against the Lodge and FF. The Lodge and FF answer the appeal. If the judgment is amended, they request indemnity/contribution from Hodge and Thompson and assert that the award was excessive. We reverse the judgment insofar as it absolves the Lodge and FF and render.
The incident occurred on October 28, 1988 at a Halloween dance sponsored by the Lodge and held in its ballroom facility. The dance was a BYOB affair, but the Lodge provided set-ups and beer. Lodge governor, J.W. Burke, was its highest ranking officer. Patrick Quirk, sgt.-at-arms, had the duty of keeping order at Lodge functions and removing anyone who caused a disturbance. Burke testified that both he and Quirk were present at the dance; they along with other officers of the Lodge were the authorized supervisors of the dance. No security guard was hired. Other Lodge officers present included Bo Howard and I.B. Crawford who "ran the door," and Floyd Newsom and Prentice Hendrix who operated the bars.
Thompson arrived at the party around 11:15 p.m. On entering, he walked over to a table where his estranged wife, Vickie, was sitting with a group of people; at the table was Hodge, who had been at the dance for about two hours.
Thompson then went to one of the bars to fix a drink, his first of the night. Hodge, on the other hand, admitted drinking approximately five beers before the altercation began. Hodge walked up to Thompson at the bar, said he wanted to talk and asked him to step into the foyer because of the loud noise in the ballroom.
When the two were in the foyer, Hodge told Thompson to stop spreading the rumor that Hodge was dating married women. He named a friend of Vickie's and was concerned about the rumors reaching the friend's husband. Thompson told Hodge that he could say whatever he wanted to say. Hodge claims Thompson shoved him at this point; Thompson claims he just turned to leave. Either way, Hodge, who was much larger than Thompson, suddenly struck Thompson on the left temple with his fist. The blow propelled Thompson's glasses off his head and across the foyer floor. Thompson then wrestled Hodge to the floor where they continued to fight and strike each other.
Burke and other Lodge members who saw the altercation intervened and broke up the fight. After pulling the two apart, Burke and three others took Hodge outside. Hodge was still furious, his nose was bleeding and he wanted to "finish" the fight. Burke left Hodge outside and returned to the foyer with Thompson. Hodge yelled at Thompson challenging him to finish the fight for two or three minutes.
Thompson was also bleeding so Burke took him into the restroom to clean him up. Burke was unsure as to where the blood was coming from, stating at trial that it must have been coming from Thompson's "nose or his mouth or somewhere." Tr. 77. Thompson, however, testified that he was *1175 scratched but was not bleeding from his nose. Tr. 34.
Hodge claimed that after about five minutes outside, he had cooled down and was capable of returning to the dance. The group outside made no attempt to bar his return. This group consisted of a Lodge member, Truett Bailey, Tom's brother, Bob, and a nonmember, Wayne Bailey. Truett testified he had no authority to stop Hodge from reentering the dance and admitted to having several drinks. Bob testified that both he and his brother were greatly agitated and wanted to finish the fight. In fact, Bob's testimony strongly indicates that Tom was still greatly agitated and inclined to violence against Thompson upon reentry. Bob testified that he thought it would calm Tom more to go inside; he also admitted his first intent was to take Tom into the Lodge by the back way because "everybody" was standing in the foyer.
Burke was standing in the foyer, his back to the door, talking to Thompson when Hodge reentered. The entourage passed right in front of Thompson who was in the path to the ballroom. Although Hodge testified that Thompson stepped toward him, no one else saw Thompson make a move and the evidence is overwhelming that Hodge, obviously still inflamed and intent on fighting, saw an opening, seized the opportunity and delivered a hard blow to Thompson's nose. Hodge testified he tried to take Thompson out with this one strike. Tr. 103. It was the only blow of the second altercation and, according to Thompson, the only blow to his nose which began bleeding profusely at this point.
Afterwards, Thompson was taken to the hospital for treatment and Hodge was allowed to return to the dance. Thompson's injuries included bruises to the temple area, several scratches, and a broken nose. Expert testimony showed that the blow caused a deviated septum in Thompson's nose and would require surgery to open the air passage on the left side.
After the first altercation, no Lodge official either called the police or asked Hodge or Thompson to leave the premises. Hodge testified that if he had been asked to leave, he would have left. Officer Tom Willis testified that the police could have reached the scene within two to three minutes. The dance hostess asked Burke after the first altercation if he wanted her to call the police. He answered, "No, everything was all right." Tr. 75. Police learned of the incident from a lady whose vehicle was stopped for a traffic violation as she was leaving the dance. The lady told the officer she was in the process of getting away from the fight at the Moose Lodge.
The court in oral reasons found that Hodge was the aggressor and the entire incident would not have occurred had he not tried to get the rumor situation straightened out in an atmosphere the court described as the "moral equivalent of a barroom." Tr. 122. The court also concluded that since both parties were members of the Lodge, they could not be classified as invitees. It therefore found that neither the Lodge nor its agents owed any duty to any party which was breached although it commented that had Thompson been an invitee, its result might have been different. The court rendered judgment in favor of Thompson and against Hodge for its jurisdictional limit of $10,000, representing medical expenses and lost wages of $707.12, future medical and future lost wages of $5,258.40, and pain and suffering of $4,035. Judgment was signed March 20, 1990 for damages, legal interest and costs in favor of Thompson and against defendant Hodge. The Lodge and FF were absolved from liability. Thompson assigns as error the trial court's finding of no duty and no breach on the part of the Lodge and seeks to have both the Lodge and FF adjudicated liable for all damages awarded in the judgment.

DUTY
As noted, the trial court found that as a Lodge member, Thompson was not an invitee and thus was owed no duty of protection which was breached. We conclude the trial court erred in concluding that Thompson was owed a lesser duty than that of ordinary care under the circumstances *1176 of this case. The trespasser-licensee-invitee classifications have been abandoned in favor of a traditional negligence analysis. Cates v. Beauregard Elec. Coop., Inc., 328 So.2d 367 (La.), cert. denied 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); Alexander v. General Accident Fire & Life Assur. Corp., 98 So.2d 730 (La.App. 1st Cir.1957), writ denied, not reported, (1958). The duty of ordinary care is owed to social guests who are invited to the premises. Alexander, supra. West Virginia courts hold that members of a Moose Lodge who go to the lodge premises for drinks are owed a duty of reasonable care. Hovermale v. Berkeley Springs Moose Lodge No. 1483, 165 W.Va. 689, 271 S.E.2d 335 (1980). Louisiana courts have stated that members of health clubs as well as customers of bars are owed a duty of reasonable care to protect them from injury while on the premises. Howery v. Linton, 454 So.2d 1283 (La.App. 2d Cir.1984); Gatti v. World Wide Health Studios of Lake Charles, Inc., 323 So.2d 819 (La.App. 2d Cir.1975); Sevin v. Shape Spa for Health and Beauty, Inc., 384 So.2d 1011 (La.App. 4th Cir.1980).
Moreover, a duty of protection which is voluntarily assumed must be performed with due care. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). Burke testified that the Lodge determined prior to this dance that Lodge officials, including himself, the sgt.-atarms, trustees and other board members would provide supervision and a reasonably safe premises for the dance. Thus, the Lodge voluntarily assumed the same duty the law imposes.
We conclude that the Lodge owes its members and guests in attendance at a Lodge sponsored dance the duty of reasonable care to protect them from injury. This duty does not extend to unforeseeable or unanticipated independent, intentional tortious or criminal acts of a third person. However, the duty arises when the Lodge officials charged with supervising the affair have or should have knowledge of a third person's intended injurious conduct that is about to occur and his apparent ability to execute that conduct and it is within the power of the Lodge officials to protect against such conduct. Rodriguez v. New Orleans Public Service, Inc., 400 So.2d 884 (La.1981); Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2d Cir. 1987); Ballew v. Southland Corp., 482 So.2d 890 (La.App. 2d Cir.1986). When the independent, intentional tortious or criminal acts of third persons constitute an unreasonable risk of harm, the duty can be discharged by summoning the police at the time the official or officers in charge know or should reasonably anticipate that the third person presents a probable danger. Hardin, supra, and citations therein.
Based on this record, the Lodge officials (especially Burke) should have recognized after the first altercation that the potential for additional misconduct was probable. Thus the Lodge owed (and assumed) a duty of reasonable care to protect Thompson from injury. Burke was obligated and authorized to take steps to prevent a continuation of the fight.

BREACH
When a duty to protect others against independent, intentional tortious or criminal misconduct exists, liability may be created by breach of that duty. To create liability, the breach must be negligent, substandard or blameworthy. Harris, supra. Whether the duty has been breached is a factual question. Since the first altercation erupted violently and without warning, and since fights were infrequent at these functions, Burke and his supervisors were not negligent or blameworthy in failing to prevent the first altercation.
However, the circumstances leading up to the second altercation require a contrary conclusion. After the first fight, tempers were high and emotions wired. Hodge's desire to continue the fight was clearly evidenced by his loud, boisterous conduct which should have placed Burke on notice that Hodge intended to batter Thompson again if given an opportunity. Hodge's actions were certainly foreseeable; Burke should have anticipated that should *1177 Hodge come close to Thompson soon after the first altercation, Hodge would attempt to finish the fight as he had threatened. Despite this, the Lodge failed to take any preventative action whatsoever.
Burke testified that all Lodge officials present were responsible for security. However, no policy or plan was derived to deal with an altercation other than, as Burke testified, to "get right on top of it and try to break it up and get everything calmed down." Tr. 66. The Lodge simply chose to use a "catch-as-catch-can" policy for dealing with altercations.
The Lodge's duty may be discharged by summoning the police at the time the officials know or should reasonably anticipate that the third party poses a probable danger. Hardin, supra, and citations therein. No Lodge official called the police. In fact, as noted earlier, Burke specifically declined a timely offer to do so. It is noteworthy, however, that Burke described this incident as a "knock-down-drag-out" fight, the likes of which had happened only once before and on that occasion, the police had in fact been called. Tr. 66, 78. Officer Willis testified he could have been on the scene in two or three minutes. After the first altercation Hodge and the group stayed outside approximately five minutes. Thus, had the police been called immediately after the first altercation was discovered, they would have been on the scene before Hodge went back into the building; in fact, if the police had been called, the very threat of their appearance may have quelled the entire situation. In addition, Burke had the authority to simply ask Hodge and/or Thompson to leave the premises. As noted earlier, Hodge testified that he would have complied with such a request. At the very least Burke could have checked on Hodge and evaluated his condition prior to a decision allowing him to reenter the dance.
Burke could have instructed responsible Lodge personnel to go outside with Hodge and monitor and control the situation, rather than leaving him in the company of his angry brother and a Lodge member who had been drinking. Cool, clear heads could have been utilized to keep Hodge outside for a sufficient time to make sure he had calmed down. The group should have checked with Burke before letting Hodge back into the Lodge and, if he was let in, made sure that Hodge did not pass by Thompson on the way. Burke did not keep Thompson out of harm's way. Instead, after leaving the bathroom, he and Thompson stood in the foyer, right in the midst of the main pathway to the ballroom.
Simply breaking up this fight between two members was not enough under the circumstances to fulfill the Lodge's duty of reasonableness to Thompson. For us to approve as reasonable the actions taken herein would absolve similar organizations from any responsibility to deter fights at social functions where alcohol is freely consumed.
If the trial court concluded that the Lodge owed Thompson a lesser duty than reasonable care under these circumstances, it was legally incorrect. Furthermore, its implicit conclusion that the applicable standard was not breached is manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979).

COMPARATIVE FAULT
By answer to appeal the Lodge and FF request that if the judgment should be reversed and they be held liable, then any damages they owe should be reduced proportionately by Hodge's and Thompson's fault. We agree with the trial court's finding that Hodge was the aggressor throughout the entire incident. In the first altercation, Thompson was defending himself; in the second, Hodge threw the one and only blow without any provocation. Accordingly, we find that Thompson was guilty of no fault and his damages cannot be reduced on the basis of La.C.C. art. 2323.
However, as between Hodge and the Lodge, not only was Hodge at fault for his intentional acts, but the Lodge was also at fault for its negligent and inattentive acts. Fault includes both intentional and unintentional conduct that causes injury. La.C.C. art. 2316; Peacock's Inc. v. Shreveport Alarm Co., 510 So.2d 387 (La.App. 2d Cir.), writs denied 513 So.2d 826, 513 So.2d *1178 827, 513 So.2d 828 (1987). Thus, Hodge and the Moose Lodge are co-tortfeasors. Zeagler v. Town of Jena, 503 So.2d 1137 (La.App. 3d Cir.1987). We must compare and allocate the fault of co-tortfeasors in accordance with Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La. 1985).[1]Snyder v. Taylor, 523 So.2d 1348 (La.App. 2d Cir.), writs denied 531 So.2d 267, 531 So.2d 268 (1988); Peacock's, supra. The applicable criteria are: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) capacity of the actors, (5) extenuating circumstances which might require the actors to proceed in haste. Watson, supra.
After considering the applicable criteria and comparing the conduct of the two defendants, we conclude the greater fault lies in the intentional actions of Hodge as opposed to the negligent omission of the Lodge. We allocate fault at 60% to Hodge and 40% to the Lodge.

DAMAGES
The Lodge and FF also assert by answer to appeal that the damage award was excessive. The trial court awarded its jurisdictional limit of $10,000, including $4,035 in general damages for pain and suffering. Before an appellate court will reduce an award of damages, it must determine from the facts and circumstances of the particular case that the award is excessive and a clear abuse of discretion. As a result of the second altercation, Thompson suffered a broken nose and a deviated septum. Medical expenses, past lost wages, future medical and lost wages, and pain and suffering were the result of this injury. Reck v. Stevens, 373 So.2d 498 (La.1979) and citations therein. The $10,000 total award under these circumstances does not present a clear abuse of discretion for this injury.

CONCLUSION
The trial court erred in failing to assign any fault to the Lodge. The judgment must, therefore, be rendered to reflect Hodge's joint and divisible liability of 60%, the Lodge's and FF's joint and divisible liability of 40% and the overlapping solidary liability of 50% against Hodge, the Lodge and FF in accordance with La.C.C. art. 2324 B. The Lodge's and FF's rights of contribution, asserted by cross-claim and answer to appeal, will be recognized. La. C.C. art. 1804. Therefore, for the reasons assigned, the judgment of the trial court absolving the Lodge and FF from liability is reversed and judgment is rendered as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Douglas Ray Thompson and against the defendants jointly and divisibly in the following proportions: Tom Hodge, 60%; West Monroe Lodge No. 1723, Loyal Order of Moose, Inc., and Fireman's Fund Insurance Co., 40%; of recoverable losses of Ten Thousand Dollars and no/100 ($10,000.00) plus legal interest from date of judicial demand; and all defendants are solidarily liable to the extent of 50% for the same recoverable losses.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of cross claimants, West Monroe Lodge No. 1723, Loyal Order of Moose, Inc. and Fireman's Fund Insurance Co. against defendant, Tom Hodge, for any amount that the cross claimants may have to pay in excess of 40% of the plaintiff's recoverable losses.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Douglas Ray Thompson and against defendants, Tom Hodge, West Monroe Moose Lodge # 1723, Loyal Order of Moose, Inc., and Fireman's Fund Insurance Company, for all costs of the trial court including expert *1179 witness fee of Dr. H.G. Taliaferro for $150.00 and discovery depositions in the sum of $252.00, costs to be allocated 60% to Hodge and 40% to the Lodge and FF.
The costs of this appeal are assessed to appellees, the Lodge and FF.
REVERSED IN PART AND RENDERED.
NOTES
[1] We note that the intentional fault of a tortfeasor and negligent fault of a victim have also been subjected to the principles of comparative fault. See, Robinson v. Hardy, 505 So.2d 767 (La.App. 2d Cir.), writ denied 508 So.2d 825 (1987); Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writs denied 502 So.2d 114, 502 So.2d 117 (1987).