675 So.2d 275 (1996)
Cornelious and Quinton MAY, Plaintiffs-Appellees,
v.
Floyd T. JONES, M.D., et al., Defendants-Appellants.
No. 28106-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1996.
*276 Theus, Grisham, Davis & Leigh by David H. Nelson, Monroe, for Defendants-Appellants.
Moore, Walters, Shoenfelt & Thompson by Oscar L. Shoenfelt, III, Baton Rouge, for Plaintiffs-Appellees.
Before SEXTON, NORRIS, BROWN, WILLIAMS and GASKINS, JJ.
NORRIS, Judge.
In this medical malpractice action, following a jury verdict against Mr. and Mrs. Quinton May and in favor of Dr. Floyd Jones and his insurer, the trial court granted the plaintiffs' motion for a judgment notwithstanding the verdict or alternatively a new trial, and defendants appealed. For the following reasons, we reverse in part, affirm in part and remand.

Facts
On August 2, 1989 Dr. Jones performed a routine breast exam on Mrs. Cornelius May as part of a complete physical. She had seen Dr. Jones once before in June, but simply for a Medi-Fast weight loss program he offered. It is not disputed that Dr. Jones found a slight fibrous area, or "thickening," as Mrs. May recalled, in her right breast; Dr. Jones recorded in Mrs. May's chart that her breasts were normal with a slight fibrous area in the right one. Nonetheless, the circumstances surrounding this discovery and significance of the finding are sharply disputed.
Dr. Jones testified at trial that upon finding the fibrous tissue he had her feel it and asked if she had ever noticed it; she said *277 something like, "Oh that, that's been there a long time." During the exam, he also explained to her how to examine her own breasts. He then recommended a baseline mammogram (first time) because she was over 50 years of age, which she refused stating she had just had a normal mammogram about a year earlier. At the end of the exam he gave her a breast self-exam ("BSE") pamphlet, and instructed her to notify him if the spot changed at all. He did not chart that he gave these instructions because, as he and his nurse testified, the BSE pamphlets and accompanying instructions are habitually given as standard office procedure. Dr. Jones testified that a fibrous area is very common and did not make him suspect cancer. Accordingly, he documented on her chart that her breasts were normal, and noted "as a memory jog" to himself that there was a slight fibrous area in the right. Because the exam was normal, no follow-up exam was needed. Dr. Jones conceded he failed to document that Mrs. May refused the mammogram. He admitted he normally tries to document such a refusal, but adamantly maintained that despite the omission, he did urge her to take the test. Dr. Jones's nurse, Bobby Higgins, also present during this exam, substantiated Dr. Jones's testimony that he recommended a mammogram, which Mrs. May refused.
Mrs. May's recollection is strikingly different. According to her, Dr. Jones essentially told her the fibrous area was nothing and not to worry. She denies that he recommended a mammogram. Though not asked, she volunteered that she had had a normal mammogram in 1987.[1] She also denied receiving any information, either verbal or written, on how to perform a BSE.
The evidence further reveals that Mrs. May saw Dr. Jones again twice later that month for various ailments. She also visited the office fairly regularly in connection with the Medi-Fast program. Mrs. May next saw Dr. Jones in November 1990, complaining of pain in her hands and arms. Thereafter, she saw him fairly regularly during 1991, about once a month for treatment of her arthritis. The evidence is undisputed that he never reexamined her breasts. In May 1991, the pain in her arms became so severe that she called his office to request a referral to a neurologist. She also requested a mammogram because of swelling in her right breast. The mammogram results were highly suspicious of cancer. According to Dr. Jones, because he had no confirmed diagnosis, he did not tell Mrs. May the results, but rather, instructed his nurse to make an appointment for her to see a surgeon. Upon physical exam Dr. John Price, a general surgeon, found the typical appearance of a very advanced breast malignancy. Within two days, Mrs. May was in surgery and a biopsy confirmed she, in fact, had cancer. A mastectomy was performed and all 10 axillary lymph nodes removed.
From June to October 1991, she received chemotherapy from oncologists, Drs. Jim Reeves and his partner William Anderson. She suffered the usual ill effects, nausea, vomiting, hair loss, weakness and suppressed white blood cell count. From December 1991 to January 1992, she also underwent radiation therapy.
In August 1992, Mrs. May began complaining of a cough and fever. In October 1992, Drs. Reeves and Anderson referred her to Dr. William Matthews, a pulmonologist, based on a change they observed in her chest x-ray. A subsequent bronchoscopy indicated she had a bacterial infection, "mycobacterium avium intracellulare." Dr. Matthews put Mrs. May on three different types of medication, one or all of which caused an adverse reaction and made her ill. Despite changes in the medication, she was eventually hospitalized in mid-May 1993 for dehydration and renal insufficiency caused by the drugs. After hydration, her condition improved and Dr. Matthews reinstituted the drug treatment. According to Dr. Matthews, if she continues to tolerate the drugs, he expects her symptoms will improve. Evidence was presented at trial which attempted to link this infection to the cancer treatment.
*278 Unfortunately, in July 1993 the cancer recurred in Mrs. May's chest wall. Both Dr. Reeves and Dr. Anderson believe the recurrence suggests cancer of the bone and agree the likelihood of curing her is negligible; she can hope to live maybe two more years. Because she has an active infection, they have rejected chemo in favor of hormonal therapy.

Procedural history
Mrs. May's medical malpractice claim was first presented to a medical review panel. On June 8, 1993 the panel, consisting of family practitioners, Drs. Myles Gaupp, Kerry Anders and Gregory Green, found that there were "material issues of fact not requiring expert opinion and which bear directly on the issue of liability." For this reason, the panel declined to express an opinion as to liability.
In November 1993, the case against Dr. Jones and his insurer went to trial, and the jury rendered a 9-3 verdict in favor of the defendants. The trial court entered a judgment dismissing the Mays' suit with prejudice. The Mays filed a motion for a judgment notwithstanding the verdict (JNOV) or alternatively a new trial with change of venue. The trial court granted the motion for a new trial and transferred venue to Ouachita Parish. On defendants' supervisory writ application to this court, the panel instructed the trial court to enter a judgment notwithstanding the verdict rather than a new trial, expressing, however, no opinion as to the correctness of the trial court's conclusions.[2] The trial court entered the JNOV accordingly and awarded damages of over $2,000,000, reduced to $500,000 plus past and future medical expenses under the Louisiana Medical Malpractice Act. The court also conditionally granted the motion for new trial under La.C.C.P. art. 1811C(1) in the event the JNOV was reversed or vacated on appeal. From this judgment, Dr. Jones and his insurer have appealed, urging the trial court erred in granting the JNOV and the conditional new trial, and alternatively, that it erred in several respects in calculating the damage award.

Legal Principles
La.C.C.P. art. 1811 governs motions for JNOV. The proper standards to apply when analyzing such a motion, either at the trial or appellate level, however, have developed jurisprudentially. As succinctly stated by the Louisiana Supreme Court:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied.

Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991), citing Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986); see also Gibson v. Bossier City General Hosp., supra. It is not within the trial court's province on a JNOV to weigh the evidence, evaluate the credibility of witnesses or substitute its judgment for the trier of fact. Anderson, supra; Wooten v. Louisiana Power & Light Co., 477 So.2d 1142 (La.App. 1st Cir.1985). Moreover, considering the harshness of the remedy, the trial court should consider the evidence in the light most favorable to the prevailing party, giving to this party the benefit of every legitimate and reasonable inference of fact. Anderson, supra; Willis v. Louisiana Power & Light Co., 524 So.2d 42 (La.App. 2d Cir.), writ denied 525 So.2d 1059 (La.1988). On review, we must determine whether the trial court committed manifest error in granting the JNOV; to affirm, the facts and *279 inferences must point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not have reached a contrary verdict. Anderson, supra.
By contrast, a motion for new trial shall be granted when the verdict appears clearly contrary to the law and evidence, and may be granted, in any case, if there is good ground therefor. La.C.C.P. arts. 1972, 1973; Bush v. Cannata's Supermarket, Inc., 612 So.2d 794 (La.App. 1st Cir.1992). A new trial may be ordered by the judge in his sound discretion and in furtherance of the interest of justice. Willis v. Louisiana Power & Light Co., supra, citing Southern Natural Gas Co. v. Roland, 240 La. 471, 123 So.2d 891 (1960); see also Lamb v. Lamb, 430 So.2d 51 (La.1983); Perkins v. K-Mart Corp., 94-2065 (La.App. 1st Cir. 6/23/95), 657 So.2d 725, writ denied 95-2058 (11/13/95), 662 So.2d 477; Bush, supra.
In contrast to the JNOV, less stringent criteria apply when deciding whether to grant the motion for a new trial; the trial judge is free to evaluate the evidence without favoring either party, and to draw his own inferences and conclusions and assess the credibility of witnesses to determine if the jury has erred in giving too much credence to an unreliable witness. Gibson, supra; Petitto v. McMichael, 588 So.2d 1144 (La.App. 1st Cir.1991), writ denied 590 So.2d 1201 (La. 1992); Pellerin v. Tudor Const. Co., 414 So.2d 403 (La.App. 1st Cir.), writ denied 420 So.2d 455 (La.1982), cert. denied 479 U.S. 824, 107 S.Ct. 96, 93 L.Ed.2d 47 (1986). Consequently, a trial court may deny a motion for a JNOV (where the judge must favor the non-mover), and yet grant a motion for a new trial (where the judge may make his own inferences and credibility determinations) because the verdict was contrary to the evidence or because the interest of justice so requires. Petitto, supra at 1149; Pellerin, supra at 406. The trial court's discretion is vast and its decision will not be disturbed absent a showing of abuse. Gibson, supra.
A medical malpractice plaintiff's burden is two-fold: (1) to establish by a preponderance of the evidence that the treatment fell below the ordinary standard of care expected in that medical specialty; and (2) to establish a causal relationship between the alleged negligent acts and the injury. La.R.S. 9:2794; Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991).

JNOV
In considering the propriety of the JNOV, we have reviewed the evidence in the manner required by Anderson, supra. Essentially the Mays contended at trial that Dr. Jones breached the standard of care in failing to properly treat the fibrous area after he discovered it; he should have recommended a mammogram or a follow-up examination. Dr. Jones flatly denied that he failed to suggest a mammogram, though he conceded he had no proof other than his and Nurse Higgins's word. Further, he cannot and does not dispute the fact that he did not urge her to have a follow-up exam; he points to his conclusion, evidenced in her medical records, that the breast exam was normal, thus obviating the need for further examination. Consequently, he contends he did not breach the applicable standard of care in recommending a baseline mammogram for screening purposes and, upon Mrs. May's refusal, transferring responsibility to her to follow the area by performing monthly self-exams.
The expert testimony regarding the proper standard of care revealed the following. Dr. Mitchell Karlan, a general surgeon from California with extensive knowledge and experience in the field of breast cancer, testified by video deposition for the Mays. Dr. Karlan believed that Dr. Jones correctly identified the "area of concern," a dominant mass present in one breast but not the other. Dr. Karlan testified that the standard of care requires that a general practitioner recommend a mammogram, and if the patient refuses, that he document the refusal and instruct the patient to return for a follow-up exam in one month. According to Dr. Karlan, it is not within the patient's province, once a dominant nodule is identified, to monitor it; changes are too subtle for a layperson to detect timely.[3] Further, if the follow-up *280 exam is also refused, the physician should document this as well. In any event, regardless of how one resolves the factual dispute between Mrs. May and Dr. Jones, Dr. Karlan opined that Dr. Jones breached the standard of care by failing to schedule a follow-up exam.
Plaintiffs also called Dr. Calvin Folds, Mrs. May's family doctor for many years prior to this incident. On direct, Dr. Folds testified that finding a fibrous area does not necessarily indicate an abnormality; however, he specified on redirect that asymmetry (a fibrous area in one breast but not the other) is "significant," and could indicate a cancerous lesion. Dr. Folds also admitted, however, that a fibrous area is not an "unusual" finding and not as suspicious as a rock-hard nodule or dimpling. He testified that the standard of care upon finding a fibrous area is to ask the patient if she is aware of it, how long it has been there and to recommend a mammogram. Based on the clinical information the physician receives in some cases, according to Dr. Folds, it is possible that the fibrous area may not warrant further study. Dr. Folds then testified, however, that he does not rely solely on the clinical findings to determine whether something is benign or malignant, but rather, refers the patient for a mammogram. No follow-up exam is required if the breast exam is normal.
Plaintiffs also introduced at trial the deposition of Dr. Myles Gaupp, a family practitioner and member of the medical review panel. According to Dr. Gaupp, the standard of care requires that upon finding an area of concern, the physician should recommend a mammogram; even if the patient refuses that test, he must re-examine her within 10-12 weeks. Dr. Gaupp opined that Dr. Jones must have felt the fibrous area was significant because he noted it on her chart. Dr. Gaupp also testified that if faced with the situation where he found an area of concern and the patient refused his recommendation for a mammogram, he would not only chart it in her medical records, but would also re-examine the breast within a reasonable period of time. Nonetheless, Dr. Gaupp opined that if Dr. Jones's testimony as to his actions is true, he did not breach the standard of care. Dr. Gaupp testified that he had not changed the opinion he gave on the medical review panel.
Finally, Dr. Jones's former nurse, Gail Dortch, testified that she believed Dr. Jones's special written notation of a "fibrous area" indicated he felt it was an abnormal finding or area of concern. She testified that whenever Dr. Jones found an abnormality, he would have the patient feel the area and ask her general questions about it. According to Ms. Dortch, Dr. Jones's standard office procedure is to document the finding, recommend a mammogram and note if the test is refused. Even if the test was refused, he would schedule a follow-up exam to recheck the area usually within three months. Further, she testified that he would not order another baseline mammogram if the patient had already had one.
Testifying as experts for defendants as to the proper standard of care were oncologist Dr. James Reeves, panel members Dr. Kerry Anders and Dr. Gregory Green, and Dr. Jones. Defendants also called Nurse Higgins.
Dr. Reeves testified that if a physician finds a "dominant mass" which is suspicious of cancer, he must follow up and order a mammogram. However, he testified that a "dominant mass" is distinct from a "slight fibrous area"; the two terms are not interchangeable. Fibrous tissue, according to Dr. Reeves, is a very non-specific term which does not necessarily imply an abnormality or cancer. On cross exam, Dr. Reeves conceded, however, that in its early stages cancer may assume any shape or consistency; further, asymmetry raises greater suspicion. Dr. Reeves testified that anything suspicious should be evaluated more carefully.
Similarly, Dr. Anders testified that a fibrous area is "significant," but certainly not equivalent to cancer. In fact, he testified *281 that a physician may find a fibrous area, ultimately conclude the breast exam was normal, and fully comply with the standard of care for a general practitioner. The physician must make a clinical decision based on his findings and the information elicited from the patient as to whether the exam is normal. According to Dr. Anders, the fact Dr. Jones charted it as normal suggests he was not suspicious of cancer. Dr. Anders testified that had Dr. Jones found a "palpable mass" or something suspicious and failed to follow-up, he would have breached the standard of care; Dr. Jones did not note a "palpable mass," but rather a "slight fibrous area." Thus, according to Dr. Anders, if Dr. Jones charted that the breast was normal with a slight fibrous area, was told that it had been there awhile and had not changed, recommended a baseline mammogram which she refused, instructed her on BSE and told her to inform him of any change, then he would not have breached the standard of care. Dr. Anders testified he believed that Dr. Jones's position before the panel, that he ordered the mammogram to help diagnose the finding, was consistent with his testimony at trial that he recommended the test for screening.
Likewise, Dr. Green testified that if a physician finds a slight fibrous area, has the patient feel it, learns that it has been there for some time without change, recommends a mammogram and concludes that the exam was normal, he has not breached the standard of care. However, upon finding something suspicious, that is, firmness, rock-hard feeling, skin changes, dimpling, or nipple discharge, then it definitely must be followed up. Dr. Green did not believe that a "slight fibrous area" could be characterized as a "dominant mass"; a dominant lesion has a distinct feel or some other clear indication of malignancy. Dr. Green admitted he did not understand, if the exam was normal, why Dr. Jones would record a slight fibrous area. Finally, he admitted that breast cancer can assume any shape or consistency.
Dr. Jones testified that slight fibrous areas in the breast are very common. At the time of Mrs. May's breast exam, the area had no characteristics of malignancy, such as retraction, stickiness or relative immobility. Based on his clinical assessment, he determined that the exam was normal and recommended a baseline mammogram. Dr. Jones testified that he does not document "normal" for something suspicious of cancer, but rather diagrams the finding in the chart, including comments on size and other physical characteristics.
Nurse Higgins corroborated Dr. Jones's testimony as to what he found and the statements and recommendations he made to Mrs. May. She substantiated that his office procedure when he felt something unusual during a breast exam was to have the patient feel it and stress the importance of regular SBEs. He also always distributed a SBE pamphlet to the patient and routinely ordered baseline mammograms for women over 50 years of age. Nurse Higgins believed that had Dr. Jones felt the area was suspicious, he would not have written "normal" in Mrs. May's chart. She testified that Dr. Jones's usual procedure was to follow up on all findings, presumably abnormal ones, but not if the exam was normal. Nurse Higgins testified that a slight fibrous area, while perhaps not normal, is also not an unusual finding; it is not like finding a lump.
Viewing the evidence in the light most favorable to Dr. Jones and his insurer, and resolving all inferences in their favor without judging credibility, as required on review of a JNOV, it is obvious that reasonable jurors might have concluded that Dr. Jones did not breach the standard of care in treating Mrs. May. The jury could have believed Dr. Jones's and Nurse Higgins's testimony that after finding the fibrous area and eliciting information from Mrs. May (duration, lack of change, etc.), Dr. Jones found the exam normal and recommended a screening mammogram. It could also have accepted their testimony that Mrs. May declined the test, stating she had just had a normal mammogram about one year earlier. As for a follow-up exam, Dr. Jones testified one was not required because the exam, despite the small fibrous area, was normal. Though his notation in Mrs. May's chart and inconsistencies in the testimony may lead to conflicting inferences as to whether Dr. Jones considered the finding significant, for *282 purposes of JNOV we must resolve any question in favor of Dr. Jones. Anderson; Willis, supra. The medical experts agreed that fibrous tissue in the breast is fairly common. Defendants presented testimony that it is within the standard of care to find a fibrous area and nonetheless conclude the exam is normal based on the clinical evidence; under these circumstances, a follow-up exam is not necessary. Several medical experts testified that if Dr. Jones followed the steps he claimed in treating Mrs. May, then he did not breach the standard of care. On the evidence presented, the jury could have reasonably concluded that Dr. Jones's actions were reasonable and within the standard of care of a general practitioner. We therefore find that the trial court erred in granting the JNOV.

New Trial
The trial court stated it conditionally granted a new trial because it believed the jury verdict was contrary to the law and evidence. La.C.C.P. arts. 1811C(2); 1972(1). In its reasons for judgment, the court discredited Dr. Jones's testimony that because he found nothing "suspicious" on physical exam, he had no obligation to reexamine Mrs. May. The trial court found the evidence showed and Dr. Jones acknowledged, as did all the experts, that a cancerous mass in its early stages may assume any size, shape or consistency; this coincides with the fibrous area which Dr. Jones identified and was later confirmed to be cancerous. Knowing this, Dr. Jones "turned the care for this life threatening disease over to the patient," while he continued to treat her for other ailments. It found the evidence essentially undisputed that any unusual area should be carefully followed and reexamined, and failure to do so constituted a breach of the standard of care. In short, the trial court concluded that even if the jury believed Dr. Jones's testimony that Mrs. May refused a mammogram, the evidence proved that he breached the standard of care in failing to reexamine her.
Dr. Jones maintained at trial that he found nothing during the breast exam to indicate cancer, and emphasized that he recorded the exam as normal. On the evidence presented, however, the trial court concluded that Dr. Jones found something unusual in Mrs. May's right breast. The expert medical testimony revealed that cancer may take any form, an asymmetric finding should heighten suspicion, and anything suspicious must be carefully evaluated and closely followed. In fact, Dr. Jones's own expert, Dr. Reeves, asserted this. Dr. Jones himself candidly admitted that the lack of certain qualities such as retraction, stickiness and relative immobility, as in Mrs. May's case, does not mean it is not cancer. Further, he conceded that "cancer can feel exactly like it felt at the time [he] made this examination." R.p. 803. Significantly, he also admitted at trial that he was aware that Mrs. May's mother and sister had died of some form of cancer. This history also raises the index of suspicion.
Regarding the medical records, the witnesses disagreed over how to interpret Dr. Jones's notation of normal and slight fibrous area, some believing this indicated a normal exam and others that he found a suspicious area. Dr. Jones attempted to explain this arguably ambiguous notation as simply a "memory jog" to himself, but as noted by Dr. Green, it is inexplicable why he would need to jog his memory for a normal exam. Moreover, the evidence is undisputed that he failed to follow up on his notation, despite ample opportunity to question Mrs. May about any changes in the fibrous area and to reexamine her. Further, the trial court noted a serious discrepancy between Dr. Jones's position before the medical review panel that he recommended the mammogram to help him diagnose the physical findings, and his testimony at trial that he recommended the mammogram solely for screening purposes. Contrary to the other witnesses at trial, Dr. Jones claimed there was really little or no difference between the two types of mammograms. The fact that he noted the asymmetrical, fibrous area on his chart, coupled with the history of cancer in Mrs. May's family, strongly suggests that he found the area suspicious and ordered the mammogram for diagnostic purposes. The trial court, in assessing Dr. Jones's credibility on the motion for new trial, was entitled to conclude the slight fibrous area indeed warranted suspicion in the instant case.
*283 The witnesses unanimously agreed that an unusual or suspicious area detected during a physical exam must be closely evaluated and carefully followed by the physician, and that failure to do so is a breach of the standard of care. The evidence strongly suggested that if this task were left to the patient, she would be unable to detect a change in the area until the cancer had advanced significantly. Further, the record shows that Mrs. May suffered from severe arthritis in her hands, obviously making self-examination more difficult. According to plaintiffs' experts, the physician must reexamine the patient within a few months. Dr. Jones's own nurses, one with tears in her eyes, testified that in Mrs. May's case he did not follow his usual procedure, which is to have the patient return so he can re-examine the area of concern.
Finally, there is no corroboration for Dr. Jones's and Nurse Higgins's testimony that Mrs. May was cantankerous and difficult; no other treating physician who testified at trial labeled her as such. To the contrary, the evidence revealed that she had always followed her physicians' recommendations for tests and even surgical procedures. It is also questionable whether her statement that she had a normal mammogram just a year ago rises to the level of a "refusal" to obtain necessary medical treatment.
Finally, we note that the trial judge, who viewed the factfinding and decision-making process firsthand, felt the verdict was driven by emotion and not reason:
Both the plaintiffs and defendants have spent considerable time in this parish in the last seven or eight years. It took two days to pick the jury in this case since a large number of people on the jury venire knew both the plaintiffs and defendant. Further, it was not possible to pick a jury where there was not some familiarity with either one or both of the parties by members of the jury. During the deliberations, there was much yelling and screaming, which confirms to this Court that the 9-3 verdict was decided with emotion and not reason as the deciding factor. R.p. 50. In conjunction with the other reasons stated, this observation is certainly significant. See Willis, supra.
On a motion for a new trial, the court is free to make its own factual inferences and credibility determinations. Petitto; Pellerin, supra. Doing so in the instant case, the trial court resolved all inferences of fact and determinations of credibility against Dr. Jones and in favor of Mrs. May. The record will support this resolution. Where the trial court has made inferences and credibility determinations which are crucial to the ultimate verdict, we cannot say that granting a new trial was an abuse of discretion. Barlow v. State Farm Mut. Auto. Ins. Co., 93-2385 (La.App. 1st Cir. 11/10/94), 645 So.2d 1256. The instant record reasonably supports the trial court's ruling, granting a new trial in the interest of justice, and because the verdict was contrary to the law and evidence. La.C.C.P. arts. 1972(1); 1973.
For the reasons expressed, the judgment of the trial court granting the JNOV is reversed, the alternative judgment granting the new trial is affirmed, and the case is remanded for a new trial.[4] Costs of appeal are assessed equally between the parties.
REVERSED IN PART; AFFIRMED IN PART; AND REMANDED FOR A NEW TRIAL.
BROWN, J., concurs. I believe the trial court's grant of JNOV was proper. This record is complete and plaintiff is very sick. A retrial seems unnecessary; however, I concur that at least plaintiffs are entitled to a new trial.
SEXTON, J., dissents with reasons.
SEXTON, Justice, dissenting:
I respectfully dissent, believing the evidence is sufficient to support the jury verdict.
NOTES
[1] The medical records show that her previous family physician, Dr. Edward Brown, performed a breast exam and sent her for a mammogram in June 1987 in conjunction with an impending hysterectomy. The results of both the physical exam and test were normal.
[2] In its reasons for judgment granting the new trial, the trial court stated that "reasonable minds could not differ that Dr. Jones was negligent in his care of Mrs. May." Based on this finding that Dr. Jones's negligence was clear as a matter of law, the writ panel concluded a JNOV, rather than a new trial, should have been granted. See Gibson v. Bossier City General Hosp., 594 So.2d 1332 (La.App. 2d Cir.1991). The case was remanded for entry of a JNOV and quantum.
[3] Dr. Lionel Barraza, a radiologist who testified for plaintiffs, agreed that though a trained physician could detect a mass at one centimeter, a patient could not detect a mass until it reaches about two and a half centimeters. However, defendants' expert Dr. Edward Brown, a retired OB/GYN, opined that a patient in some instances can detect a mass at less than two and a half centimeters.
[4] We are cognizant that the trial court ordered venue changed to Ouachita Parish in its reasons for judgment. However, the judgment conditionally granting the new trial contains no such ruling. An appeal lies from the judgment and not the reasons therefor. Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2d Cir.1987). The issue of venue is thus not before this court.