528 So.2d 724 (1988)
Donald J. SAVOIE and the Hanover Insurance Company
v.
DEERE & COMPANY and Waguespack Machinery, Inc.
No. 87 CA 0238.
Court of Appeal of Louisiana, First Circuit.
May 17, 1988.
Rehearing Denied June 24, 1988.
*725 Charles A. Schutte, Jr., Baton Rouge, for plaintiffs Mass. Bay Ins. & Donald J. Savoie.
L. Michael Cooper, Baton Rouge, for defendant Deere & Co.
Arthur Andrews, Baton Rouge, for defendant Waguespack Machinery, Inc.
Before SHORTESS, LANIER and CRAIN, JJ.
SHORTESS, Judge.
Donald J. Savoie and Massachusetts Bay Insurance Company[1] (plaintiffs) brought this suit against Deere & Company (Deere) and Waguespack Machinery Service, Inc. (Waguespack) for losses sustained when a *726 lawn tractor manufactured by Deere caught fire while being refueled. Plaintiffs contend the fire was caused by faulty design by Deere and by negligent repairs made by Waguespack, who had serviced the tractor a few weeks before the fire. The trial court found that the loss resulted from defects in design and warnings attributable to Deere. The court further found that Waguespack was negligent but that Waguespack's negligence was not a proximate cause of the fire. Both plaintiffs and Deere have appealed the judgment in favor of Waguespack.
FACTS
On Sunday, July 19, 1981, Donald J. Savoie (Savoie) was fishing at Grand Isle. His son Steven and Barry Bergeron intended to join him after morning church services. The Savoies' 1973 model 110 John Deere lawn tractor was parked under the carport of their home in Belle Rose. Steven's mother Mable Savoie asked him to refuel the tractor before he left so she could mow later in the day.
Steven testified he removed the gas cap and placed it on the footrest. He placed his left foot on the footrest, inserted the flexible nozzle of the gas can into the opening in the gas tank, and began to pour. After three or four seconds, Barry, who was standing with one foot on the opposite footrest, yelled, "Watch it." Steven testified he could feel heat under his left arm; he looked up, saw the flames coming from the mouth of the gas tank, dropped the gas can, and backed into a storage closet. The can rolled, spilling gasoline. Steven escaped from the closet and, with Barry's help, moved the cars from under the carport. The fire spread, and eventually the entire house burned.
Approximately six weeks prior to the fire, Waguespack had serviced the Savoies' tractor. Lloyd Waguespack, Waguespack's president and general manager at the time of the repairs, had replaced an inoperable Deere solenoid with a part not recommended by Deere, a universal or "will-fit" solenoid.[2]
The original Deere and the universal solenoids have quite different configurations. The Deere solenoid has two terminals which project perpendicular to the tractor frame, while the universal solenoid has a terminal on each side which project parallel to the frame. The Deere solenoid is designed so that the terminals will not contact the frame. The universal solenoid, however, provides little clearance between the terminals and the frame. Both solenoids are designed to be fastened to the tractor frame with two bolts.
Waguespack's testimony as to his installation of the solenoid is as follows. He had no Deere solenoids in stock, so he substituted a universal solenoid. He tried the universal solenoid in several different positions to find the position which provided the most clearance and finally installed it with the domed end up, which he stated provided one-half-inch clearance from any metal. However, he was able to secure the solenoid to the frame with only one bolt rather than two using this position. He foresaw no problem with this one-bolt installation because he thought the stiff battery and starter cables would hold the solenoid in place. After installing the solenoid, he placed a soft plastic protective boot over the positive terminal.
Plaintiffs and Deere contend that this method of installation by Waguespack caused the fire which destroyed Savoie's house. Ron Hendry, plaintiffs' expert, testified that the most likely cause of the fire was that the boot was cut by the sharp edge of the battery tray (the metal pan in which the battery rested), which allowed the positive terminal of the solenoid to contact the battery tray, causing a spark which ignited the gasoline vapors displaced from the gas tank by the gasoline Steven poured into the tank. Gilbert Buske and Martin Berk, Deere's experts in mechanical engineering and the design of lawn and garden equipment, agreed with Hendry that the solenoid was the most probable cause of the fire.
Plaintiffs also contend that Deere's design was defective because the fuel tank *727 was located next to the battery and over the solenoid and because the solenoid was placed in close proximity to the battery tray. Berk testified that Deere deliberately placed the mounting holes for the solenoid close to the fuel tank to prevent the installation of a universal solenoid with the domed end up. The solenoid will function in that position, but the solenoid and starter will wear out prematurely.[3]
The trial court rejected the opinions of Hendry, Buske, and Berk and found that the fire was caused by static electricity. The static electricity theory was advanced by Leonard Adams, Waguespack's expert in electrical engineering and fire reconstruction, who theorized that agitation of the gasoline by pouring created a surface tension static which was discharged when the nozzle touched the tank, creating a spark which ignited the gasoline vapors in the tank. The trial court found this theory "most closely aligned to [eyewitness] accounts of events of ignition."
TRIAL COURT'S FINDING AS TO DEERE
The trial court exonerated Waguespack from liability when it found the fire was caused by static electricity and not Waguespack's improper installation of the solenoid. However, the court found Deere solely liable for plaintiffs' loss because of the following "defects and unreasonably dangerous conditions":
1. The manufacture of the fuel tank from metal with inadequate design and safety features to prevent fires originating from static electricity.
2. The location and design of positive battery terminal, its grommet, the metal fuel tank, the solenoid and the routing of the positive battery cable all in close proximity to each other under the hood of the tractor;
3. The design and manufacture of Models 110 with inadequately protected positive battery terminals in close proximity to the metal fuel tank opening (THE SECOND MOST LIKELY CAUSE OF THE FIRE) resulting in an unreasonable danger of fire.
The court further found that Deere failed to give adequate warnings of the "serious unreasonable fire hazard created by the placement of the fuel tank and the inherent danger of fires originating from static electricity."
Deere contends the trial court erred in finding that its design was the cause of the fire. In view of the trial court's finding that the fire was caused by static electricity, the second and third "defects and... conditions" listed by the trial court and Deere's failure to warn of the "hazard created by the placement of the fuel tank" could not be proximate causes of the fire because they are not related to static electricity. Thus, the trial court erred in finding Deere liable for defects which the court found did not proximately cause the fire.
Only the first of the "defects and... conditions" relates to static electricity. However, there is not a scintilla of evidence in the record to support the trial court's finding that the fuel tank was defectively designed because it was made of metal and had no safety features to prevent fires caused by static electricity. The trial court's finding that the fuel tank was defectively designed is based on two erroneous premises: (1) that a finder of fact may consider evidence outside the record; and (2) that a plastic gas tank would have alleviated any static electricity problems.
The trial court based its finding in part on the testimony of an expert witness in a 1923 federal case from Maine, Standard Oil Co. v. R.L. Pitcher Co., 289 F. 678 (1st Cir.1923). The court states in its reasons for judgment that the testimony in Standard Oil "established that scientific knowledge on [the] inherent danger [of static electricity] was available to experts some fifty years prior to 1973." Based on this testimony, the court held that Deere could have known about this "inherent danger." *728 Even if the facts in Standard Oil were analogous to the instant case, which they are not, a finder of fact cannot consider evidence outside the record in making its findings. Determinations of fault must be based on the evidence in the record. Brown v. Rudy Smith Service, Inc., 441 So.2d 409, 413 (La.App. 4th Cir.1983). The resolution of material issues of disputed fact by judicial notice is improper. Brown, 441 So.2d at 413.
Furthermore, the trial court apparently was confused about the expert testimony properly before it. The court states that Deere improperly manufactured the fuel tank from metal; the testimony of Buske is quoted to show that the technology was available in 1973 to produce a plastic fuel tank. Berk testified, however, that problems with static electricity developed after plastic tanks began to be used because plastic, unlike metal, is a poor conductor of static electricity, which allows a buildup of static during refueling. Berk further testified that the tractor in question was grounded from normal static spark because the frame is all metal and is mounted on rubber tires which are conductive of static electricity. For these reasons, the trial judge was clearly wrong in holding that Deere's design of the fuel tank was the cause of plaintiffs' losses.
TRIAL COURT'S FINDINGS AS TO WAGUESPACK
A. STANDARD OF REVIEW
Plaintiffs and Deere contend that the trial court erred in holding that Waguespack's negligence was not a proximate cause of the fire. In order to affirm the trial court's factual findings as to Waguespack, we must find that there is a reasonable factual basis for the findings and that those findings are not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). A finding may be clearly wrong in spite of the presence of some evidence in the record which, if believed, would support the finding. The appellate court should determine whether the trial court's judgment is clearly wrong considering all the evidence. Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Brown v. Rudy Smith Service, Inc., 441 So.2d at 412. We shall first consider the testimony of the four expert witnesses in this case.
B. TESTIMONY OF RON HENDRY
Ron Hendry testified for plaintiffs as an expert in mechanical engineering and failure analysis. He stated that it was difficult to determine from examination of the remains of the tractor the original amount of clearance between the positive terminal of the solenoid and the battery tray because of the damage to the tractor in the fire and the possibility that the situation was altered in the process of cutting the remains apart. It was his opinion, however, that Waguespack's installation of the solenoid was "an inferior type" which provided a high potential for an eventual shorting contact between the positive solenoid terminal and the battery tray. He stated that the nut on the one bolt attaching the solenoid mounting bracket was positioned on the extreme edge, indicating that the solenoid was as close as possible to the battery tray. He further stated that the close contact between the terminal and the battery tray could have led to the soft plastic boot over the terminal being cut by the sharp, thin, fabricated metal edge of the battery tray.
Hendry testified that in his opinion the most likely, logical cause of the fire was this shorting contact between the positive solenoid terminal and the battery tray. Had Waguespack installed the universal solenoid in the domed-end-down position, such contact would have been virtually impossible because there would have been adequate clearance.
On cross-examination, Hendry explained that the solenoid theory was consistent with the testimony of Steven and Barry. The young men testified that they did not move the tractor, heard no sound of ignition, and saw flames only on the tip of the nozzle of the gas can and at the mouth of the gas tank. Hendry explained that any pressure on the tractor, even as little as five pounds, could cause minute movement or deflection of the tractor, closing the tiny gap between the battery tray and the terminal; *729 that the sound of ignition would have been muffled by the rubber boot; and that the flames would have traveled from the ignition source to the source of the vapors, the mouth of the gas tank, so quickly that they would not have been noticed by Steven or Barry, neither of whom was looking at the solenoid area when the fire started.
Finally, Hendry discounted sources of ignition other than the solenoid. He stated that contact by the gas can with the positive battery terminal was the second most likely source of the fire, but he discounted that theory because of testimony by Waguespack and Steven and Donald Savoie that the battery terminals were covered by a hard plastic boot and because of testimony by Steven that he was pouring over the motor and not on the side by the battery. Hendry discounted the static electricity theory because the environmental conditions, i.e., high humidity, prevented a buildup of static and because Steven's testimony indicated there was contact between the nozzle of the gas can and the gas tank before he began pouring.
When questioned as to Deere's design of the tractor contributing to the fire, Hendry stated that the placement of the solenoid under the gas tank was "unnecessarily" but not unreasonably dangerous and that the placement contributed to the fire "in a minor way." He stated that it was foreseeable that substitute solenoids would be used on the tractor, but that the improper installation by Waguespack "almost stretches the foreseeable misuse situation."
C. ADMISSIBILITY OF DEFENDANT'S EXPERT'S TESTIMONY AGAINST CO-DEFENDANT
Gilbert Buske was called to testify by Deere as an expert in mechanical engineering and design and engineering of lawn and garden tractors. Waguespack objected to the testimony of Deere's expert being used against it under the rule of Rancatore v. Evans, 182 So.2d 102 (La.App. 4th Cir. 1966). Waguespack later called Buske as its own witness under the assumption that the trial court was applying the Rancatore rule. Plaintiff then attempted to cross-examine Buske but was prohibited by the trial court from cross beyond the scope of Waguespack's direct. Plaintiffs assign as error the trial court's refusal to allow them to fully cross-examine Buske during Waguespack's case.
It is unclear from the trial court's written reasons whether the court used the testimony of Deere's experts against Waguespack and vice-versa.[4] Plaintiffs contend the testimony of all experts should have been considered by the trial court against all defendants, and, if it did so, any error in prohibiting full cross-examination of Buske was harmless. If it did not do so, however, plaintiffs contend the trial court misapplied Rancatore. Deere, however, assumes the trial court did use the testimony of Waguespack's expert against it and assigns this as error.
In Rancatore, the court held that testimony of a defendant on cross-examination by plaintiff's attorney under LSA-C.C. P. art. 1634 may not be used by said defendant to support his claims against his co-defendant. 182 So.2d at 108. Article 1634 permits a party to call his opponent or his opponent's "representative," defined as the opponent's "officer, agent or employee," and cross-examine him without "vouching for his credibility, or being precluded from impeaching his testimony." The reason for this rule is that generally a litigant's opponent or his representative would be an adverse or hostile witness and thus the prohibition against leading or impeaching one's own witness normally ought not apply. See Pugh and McClelland, The Work of the Louisiana Appellate Courts, 1974-75 TermEvidence, 36 La.L.Rev. 651, 660 (1976). Rancatore is not applicable to a situation where the testimony of one defendant's expert witness is sought to *730 be used against a co-defendant. Furthermore, none of the experts in this case were called under article 1634, nor could they have been.[5] Normally, an expert is not "a party or his representative." There is no presumption that an expert is hostile or adverse to anyone, and his testimony may be fully considered by the trier of fact in its search for the truth. Thus, the trial court erred if it did not consider the testimony of Deere's experts in determining Waguespack's liability, and that testimony shall be considered by this court in determining whether the trial court's finding as to Waguespack was clearly wrong.
D. TESTIMONY OF GILBERT BUSKE
Buske testified that it was impossible to tell from the remains of the tractor whether or not there was clearance between the solenoid terminal and the battery tray. He stated it was possible to mount the solenoid in a position on the mock-up so that contact is made, but if mounted on the same plane as the burned parts, there is approximately 1/8-inch clearance. However, there is no way to determine whether the placement of the parts was changed during or after the fire.
Buske testified that he did not know for certain what caused the fire, but the most probable cause was the improper installation of the solenoid. He theorized that the gas being poured into the tank displaced the vapors in the tank; that the gas vapor, being heavier than air, moved out of the tank and straight down, flowing by the solenoid; that by the time the vapors reached the solenoid approximately 14 inches below they were combustible; that the sharp edge of the battery tray had previously cut through the soft plastic boot on the terminal; that the deflection caused by a foot on the footrest closed the gap between the solenoid terminal and the battery tray; that a spark ignited the vapors; and that the flames traveled upward so fast that they were first noticeable at the mouth of the tank.
Buske testified that twelve volts would not arc, so metal-to-metal contact was necessary to make a spark. Although Buske found a 1/8-inch gap between the solenoid terminal and the battery tray on the mock-up, he noted that there was a 1/64-inch tolerance on the stamped parts, and the solenoid could be moved back and forth up to ¼-inch because of the slotted mounting holes. Additionally, he noted the solenoid tended to swing back and forth when mounted with only one bolt.
Buske also testified that so little noise would be made upon ignition that he did not know whether someone would hear the noise or note it if heard.[6] Although the spark would be intense enough to ignite gas vapors, he doubted whether the spark could have been seen by Steven and Barry because of the position of the solenoid. Furthermore, he stated that even if one were looking directly at the solenoid at ignition, the flame would travel so fast back to the source that it would be impossible to tell where the fire originated.
Buske discounted all other theories of ignition. He stated the positive battery terminal could not have caused the spark because of the hard plastic boot and because Steven was filling the tank from the side opposite the battery. He testified unequivocally that the fire could not have originated in the gas tank because the gas vapors were too rich, i.e., had too little air, to burn.
When questioned as to the design of the tractor, Buske testified that a solenoid should be close to the battery so that there is low resistance in the battery cables; that the solenoid could be mounted on the wall of the frame facing the driver, but it needs to be located so that it would not be touched inadvertently by the owner; that in designing a tractor the closeness of the solenoid to the gas tank is not considered *731 because a designer does not expect a solenoid to be mounted so that shorting contact is possible; that it is absolutely foreseeable that substitute replacement parts will be used; but that it is not foreseeable that a mounting bolt would be deliberately left off. As for the placement of the gas tank, battery, and solenoid under the hood, he stated that in 1973 there was no better place to put them; that a metal gas tank could not be shaped properly to fit under the seat without raising the center of gravity, thereby making the tractor prone to tipping; and that plastics were too unreliable in 1973 for use as gas tanks.
E. TESTIMONY OF MARTIN BERK
Martin Berk, a mechanical engineer employed by Deere from 1951 to 1984, who designed the tractor in question, testified for Deere as an expert in engineering and design of tractors. He opined that the most probable cause of the fire was the improper installation of the solenoid. Berk theorized that the battery tray and solenoid terminal were close enough that when Steven's foot touched the PTO shroud, a guard on the outside of the tractor which protects a pulley assembly, clearance was lost and a spark ignited the gas vapors.
He testified that although there is a 1/8-inch clearance between the solenoid terminal and the battery tray if installed at the same angle as the remnant, and metal-to-metal contact is necessary to make a spark, it is impossible to tell what the clearance was before the fire. Heat from the fire could have relieved tension and moved the solenoid downward, away from the battery tray. Additionally, the remnant solenoid could be up to 1/16-inch larger than the solenoid used in the mock-up, and the "slop" in the bolt holes on the battery tray could allow up to another 1/16-inch difference.
Berk agreed with Hendry and Buske that the plastic boot would have precluded a spark from contact between the positive battery terminal and other metal. He further testified that static electricity was not a problem with lawn tractors with metal tanks in 1973 because they were grounded from normal static spark and because the metal gas tanks dissipated static charges. He also stated that moving the solenoid would not have prevented the fire because gas vapor would be in many places under the hood of the tractor.
F. TESTIMONY OF LEONARD ADAMS
Leonard Adams testified for Waguespack as an expert in electrical engineering and fire reconstruction, including cause and origin. Adams testified that his investigation had eliminated the improper installation of the solenoid as a possible cause of the fire because the tractor had been used without problem several times since Waguespack's installation of the solenoid and because he was unsuccessful in achieving contact between the solenoid terminal and the battery tray on a 1974 model 110 Deere tractor made available to him by Waguespack (although during an in-court demonstration the solenoid terminal and battery tray on the mock-up were brought within 1/1000th of an inch of each other). Additional factors in discounting the solenoid as a source were that, as installed by Waguespack, vibratory movement would increase the clearance between the solenoid and the battery tray; that gas vapors would be too lean (would have too much air) to burn 14 inches below the tank; that Steven and Barry would have noticed the flame and "been very impressed" had it started at the solenoid; and that the sound of ignition (the arcing and subsequent "whoosh") would have called attention to itself and thus been noticed.
Adams testified that he did not really know how the fire started. However, based on a hypothetical question which included the assumptions that neither Steven nor Barry touched the tractor before the fire; that the gas can never touched the tractor before the fire; that the nozzle of the gas can did not touch the opening in the gas tank until after Steven had been pouring a few seconds; and that the tractor was not moved in any fashion before the fire, Adams concluded that the only available source of ignition was static electricity. *732 Adams stated that a static charge system of XXXX-XXXX volts is needed to create a spark hot enough to ignite gas vapors, but that based on the hypothet, he would have to say that that much energy had built up in the gas tank in the few seconds Steven poured.
When it was pointed out to Adams that Steven had touched the tractor before the fire when he removed the gas cap and placed his foot on the footrest, Adams stated that that fact was not essential to the hypothet because the static charge was on the surface of the gas itself. Adams also testified that the static charge was independent of atmospheric conditions and could build up even in metal gas tanks.
Adams disagreed with Buske that the mixture inside the gas tank was noncombustible, stating that there was a possibility that air got into the tank through the cap. He admitted that in tests he performed he was unable to ignite gas in a small pan in an open area by striking a spark three to four inches over it, but he maintained that had he tried 100 times he could have eventually ignited the vapors "by adjusting the spark to the proper level" somewhere between three and thirteen inches.
G. WAS THE TRIAL COURT'S FINDING CLEARLY WRONG?
After reviewing all of the evidence, including the tractor remnants and the mock-up, we find that the decision of the trial court exonerating Waguespack from liability was clearly wrong. Although there is some evidence (Adams' testimony) to support the theory that static electricity caused the fire, that evidence is based on the assumption that Steven inserted the nozzle and poured for several seconds before touching the nozzle to the opening in the gas tank. Steven testified that when he inserted the nozzle into the gas tank before pouring, the ring around the nozzle may have hit the opening of the gas tank. Barry testified that the nozzle touched the mouth of the fill hole, but he did not know if that was the first contact between the gas can and the tank. The trial court apparently recognized this discrepancy because it stated in written reasons that the spark "may have been set off at initial insert or during the pouring process." However, if the charge was built up during pouring as Adams testified, there could be no spark set off during initial insert.
Additionally, Adams own experiments belie his statement that a combustible mixture "possibly" was in the tank. The tank holds approximately six inches of gasoline. Adams could not get a combustible mixture three to four inches above an open pan of gasoline in his experiment but stated he could have eventually had he raised the height of his spark to somewhere between 3 and thirteen inches. Even assuming the gas tank was totally empty, Adams could have raised his spark only two to three inches and still have been within the range of vapors in the tank.
APPELLATE REVIEW OF THE FACTS OF THIS CASE
When an appellate court decides the trial court is clearly wrong, it must make an independent review of the record before it and decide which party should prevail by a preponderance of the evidence. McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986); Gonzales v. Xerox Corp., 320 So.2d 163, 165 (La.1975).
Our review of the facts in this case, as set forth above, shows that plaintiffs have proven by a preponderance of the evidence that the most likely cause of this fire was shorting contact between the positive solenoid terminal and the battery tray. All other theories of ignition have been disproved by credible expert testimony.
Waguespack admitted in his testimony that he installed the non-recommended solenoid with only one mounting bolt and in a position obviously not intended by the manufacturer. It is clear, and we so find, that his negligence in so doing was a proximate cause of this fire.
Plaintiffs and Waguespack contend Deere was negligent in its design of the tractor. In order for a plaintiff to recover from a manufacturer in a products liability action, the plaintiff must prove that the *733 harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 113 (La.1986). There is no evidence in the record that Deere's design was unreasonably dangerous to normal use. Plaintiffs' own expert, Ron Hendry, testified that Deere's placement of the solenoid was not unreasonably dangerous. Buske testified that there was no better place to put the gas tank, battery, and solenoid in 1973 than where Deere put them, and Berk testified that moving the solenoid would not have prevented the fire.
"Normal use" of a product encompasses all reasonably foreseeable misuses of a product. Bloxom v. Bloxom, 512 So.2d 839, 841 (La.1987). Deere could reasonably foresee that a universal solenoid would be substituted for the Deere solenoid. It could not, however, have reasonably foreseen that a mechanic would install a universal solenoid upside down and with only one bolt in a manner obviously not intended by Deere. We thus find that Deere was not negligent in its design.
Deere contends the trial court erred in finding that Steven was not negligent in refueling the tractor under the carport. The Deere operator's manual warns: "Never ... fill fuel tank indoors." Steven was fueling the tractor in a large carport which was open on the back and front, the two longest sides. Such a carport is not considered "indoors" in the usual sense of the word. Thus, the trial court was not clearly wrong in finding that Steven was free from fault.
For the above reasons, we find that this fire was caused solely by the negligence of Waguespack.
DAMAGES
Defendants have not appealed the amount of damages awarded to Massachusetts Bay Insurance Company for property damage paid under its policy or the damages awarded to Donald Savoie for his deductible under the policy, the uninsured loss of personal property, and uninsured loss of the dwelling. The only item of damages at issue herein is the award of $5,000.00 to Donald Savoie for loss of use of his house and mental anguish. Deere contends that no damages should have been awarded for mental anguish because Savoie was not present when the fire occurred but arrived on the scene approximately five hours after the fire began. Plaintiffs contend, however, that the amount awarded for loss of use, inconvenience, and mental anguish should be increased to $50,000.00.
The law is clear that in a tort action damages may be awarded for inconvenience and mental anguish caused by injury to one's property when one is present or nearby and witnesses the destruction of his property. Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955); Broome v. Gauthier, 443 So.2d 1127 (La.App. 4th Cir.1983), writ denied, 445 So.2d 449 (La.1984). Donald Savoie's testimony is uncontradicted that when he arrived the fire was "still burning and smoldering." Thus, he did witness his property being destroyed. However, one may not recover damages for mental anguish unaccompanied by psychic trauma in the nature of or similar to physical injury directly resulting from the property damage, i.e., for normal worry and frustration. Thompson v. Simmons, 499 So.2d 517 (La. App. 2d Cir.1986), writ denied, 501 So.2d 772 (La.1987). No evidence was presented to indicate that Savoie required medical care or suffered extraordinary worry and frustration, but we deem it unnecessary to decide whether a separate damage award is necessary for mental anguish because the trial court's award of $5,000.00 was for both mental anguish and inconvenience.
Savoie may certainly recover damages for inconvenience. Before the fire, Savoie, his wife, and four teenage children lived in a house with approximately 3,000 square feet of living space. During the year it took to rebuild the house, the Savoie family lived in a borrowed 700-square-foot house trailer, which caused great disruption in Savoie's lifestyle. We find no abuse *734 of discretion in the trial court's award of $5,000.00 for Savoie's general damages.
CONCLUSION
For the foregoing reasons, the decision of the trial court is reversed as to the liability of Waguespack, reversed as to the liability of Deere, and affirmed as to the amount of damages. Judgment is hereby rendered against Waguespack Machinery Service, Inc., in favor of Donald J. Savoie in the sum of $51,720.95 and in favor of Massachusetts Bay Insurance Company in the sum of $169,625.00, together with legal interest thereon from date of judicial demand until paid. Costs of trial and appeal are taxed to Waguespack.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
NOTES
[1] Suit was originally brought by the Hanover Insurance Company. The petition was amended to substitute Massachusetts Bay Insurance Company (one of the Hanover Insurance Companies).
[2] A solenoid is an electromagnetic switch which transfers power from the battery to the starter.
[3] In the domed-end-up position, vibrations while operating the tractor will close the circuit and engage the starter momentarily. In the proper position, gravity will help the solenoid's internal spring keep the circuit open.
[4] In its written reasons, the trial court stated that the "question ... whether the expert witness testimony presented by John Deere can be used against Waguespack Machinery Service, Inc. a co-defendant" would "be addressed and decided [t]herein." However, the issue is never mentioned again in the written reasons.
[5] Martin Berk fits the definition of representative because he is a former employee of Deere, but he could have been called under article 1634 only by plaintiffs because Waguespack is not an adverse party.
[6] He stated there would be "not much woosh." (sic)