763 So.2d 779 (2000)
Billy Wayne DARTLONE and Cynthia Dartlone, Plaintiffs-Appellees,
v.
LOUISIANA POWER & LIGHT COMPANY a/k/a Entergy Corporation and the City of Monroe, Defendant-Appellant.
No. 33,597-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 2000.
Rehearing Denied August 17, 2000.
*781 City of Monroe Legal Dept. by Nanci S. Summersgill, Assistant City Attorney, Crawford & Anzelmo by Donald J. Anzelmo, Monroe, Counsel for Appellant, City of Monroe.
Cotton, Bolton, Hoychick & Doughty, L.L.P. by David P. Doughty, Rayville, Counsel for Appellees.
Before PEATROSS, KOSTELKA & DREW, JJ.
PEATROSS, J.
This appeal arises out of the fatal electrocution of 17-year-old Jed Dartlone. On July 20, 1994, while working a summer job for the Tensas Basin Levee Board, which consisted of cleaning and weedeating the levee area, Jed noticed a wire lying in an area of tall grass. He picked up the wire and was electrocuted and he died instantly. Jed's parents, Billy Wayne and Cynthia Dartlone, sued Louisiana Power & Light Company, a/k/a Entergy Corporation ("LP & L") and the City of Monroe ("the City"). LP & L settled with the Dartlones prior to trial, leaving only the City as a defendant. After a bench trial, the trial court found that the City owed a duty to Jed, had breached that duty and was 100 percent at fault in the accident. The trial court awarded the Dartlones $709,958.55 in total damages, representing $350,000 per parent in wrongful death damages and $9,958.55 in special damages, with legal interest from the date of judicial demand.
The City appeals, assigning the following six errors: (1) the trial court erred in finding that the City owed a duty to Jed; *782 (2) the trial court erred in finding that the City breached its duty to Jed; (3) the trial court erred in finding that the City was not protected by statutory immunity; (4) the trial court erred in finding that expert witness Rick Brooks had a conflict of interest and striking the entirety of his testimony; (5) the trial court erred in finding that the City was solely at fault in the accident that killed Jed and in failing to assess the fault of the decedent and third parties; and (6) the damage award constitutes an abuse of discretion.

FACTS
On the morning of this tragic accident, Jed and a co-worker, Alphonso Scott, were instructed to clean and weedeat on the Ouachita Parish Levee, north of the City. The area where the boys were to work was next to the Monroe pumping station facility, near the 800 block of Park Avenue. To the west of where the boys parked their truck was the pumping station and to the east was a set of stairs. Jed was driving the truck that morning and exited the truck on the east side next to the stairs. The grass was very tall and thick. Jed reached down to pick up a piece of wire lying in the grass and was electrocuted. Alphonso testified that Jed fell face forward into the grass. The wire was bare, silver in color and was not rubber-coated or insulated, which would have indicated that it was a power line. Alphonso also testified that there was nothing to indicate that the wire was a downed power line; but, when he touched Jed's blue jeans, he felt an electric shock. Alphonso immediately radioed his supervisor to report the accident and get assistance. The accident occurred at approximately 10:00 a.m.
The power line, electricity and all other equipment involved in this accident were owned by LP & L, not the City; and the parties stipulated that the accident did not occur on City property. In fact, there is an LP & L substation very near where the accident occurred. The downed power line was "just over" the substation's fence.
Earlier that morning, at approximately 8:00 a.m., the downed line had been reported to another City employee by Johnny Frith, a part-time City employee who had been mowing near the pumping station. Arnold Rowell, City Maintenance Supervisor, to whom Mr. Frith reported the downed line, was in charge of the City's water treatment facility, which was located several hundred yards from the downed line. The downed line supplied power to the pumping facility; and, concerned about people using the levee possibly coming into contact with the line, Mr. Rowell walked over to the line to examine it. Mr. Rowell saw the cable lying across a metal stairway and noticed no burn marks that would have indicated an energized line. Mr. Rowell concluded that the line was a guide wire for the telephone pole. In order to determine whether the line was, in fact, a guide wire or a power line, and to determine whether it had anything to do with the river pumping station, Mr. Rowell sent out two other City employees, Gerald Battaglia and Marvin Sloan, both electricians, to examine the line.
That morning, Mr. Battaglia and Mr. Sloan had been working to isolate and repair a chlorine leak at the water treatment facility. Both men testified that the chlorine leak had been isolated at the time they went to investigate the downed line, which was approximately 8:25 a.m. They also testified that, on arriving at the scene of the suspected downed line, they noticed that one phase of the three-phase Delta System[1] that serviced the pumping station was down. Before exiting the truck, Mr. Battaglia radioed the following message to Joe Wright, the operator at the plant: "We have a power line down. Don't know if its alive or dead. We will sit with it until LP & L arrives. Call Arnold [Rowell] and *783 tell him to call LP & L." Mr. Battaglia then exited the truck in order to inspect the line. Mr. Sloan testified that he did not exit the truck out of "respect" for electricity.
Mr. Battaglia testified at trial that he positioned himself within 12 inches of the line and noticed that it was lying across the metal railing of the stairway. Mr. Battaglia further testified that, since the line making contact with the metal railing was lying in the wet grass and there was no smoke or smell, he concluded that the line was dead. He also testified, however, that he had taught safety classes on the topic of electricity in which he instructed students that one should never assume that a line is dead unless you can "check behind" the line to ensure that it is not energized. Both Mr. Battaglia and Mr. Sloan testified that they did not "check behind" this line and Mr. Sloan admitted that he just assumed the line was dead. Furthermore, neither Mr. Battaglia nor Mr. Sloan was confident enough of this assumption to touch the line. Nevertheless, the two men chose not to stay with the power line as they had told Mr. Wright they would do, but, instead, returned to the pumping facility. No barricades, warnings or markings of any kind were put out to warn the public of the downed power line.
The record reveals differing testimony as to who told whom to call LP & L. The reality is, however, that neither Mr. Rowell, Mr. Wright, Mr. Battaglia nor Mr. Sloan contacted LP & L regarding the downed line. Gerald Massey, the Water Treatment Supervisor for the City testified that it is policy to call LP & L upon noticing a downed line which services the facility. All of the evidence indicates that the only way for LP & L to gain knowledge of a downed power line, such as the one that resulted in Jed's death, is by customer reports or passers-by who notice the downed lines and call LP & L to report them. The City was the customer of LP & L serviced by this particular line.
Todd Borderloin, a Planning Engineering Supervisor with LP & L, testified at trial on behalf of the Dartlones. Mr. Borderloin was called to the accident site as a representative of LP & L. Mr. Borderloin testified that LP & L's lightning tracking system had indicated a lightning strike in this area on the day prior to the accident. He explained that the lightning tracking system indicates a one half to one mile area in which lightning strikes have occurred, but does not "pinpoint" the exact location of such strikes and does not indicate whether any equipment owned by LP & L has been struck. Rather, it is a device utilized to measure the intensity of the weather in a general area so that LP & L can allocate repair resources effectively. He also testified concerning the presence of "lighting arresters" on the electrical distribution system involved in this case, stating that there were such arresters in place on this system[2] and that the wire had been spliced in several places prior to the accident.
Mr. Borderloin also testified that LP & L has no procedure or policy for locating downed power lines; rather, as previously stated, it relies on customers or passers-by to report such problems. He did admit, however, that LP & L was aware that, if a line in a Delta System such as this was to fall, it would remain energized unless it was "solidly grounded."
Another LP & L employee assigned to investigate the accident was Danny Carpenter, an Area Design Supervisor. Mr. Carpenter also testified at trial that there were lightning arresters in place. He further testified that the line had been spliced several times.[3] Mr. Carpenter confirmed *784 Mr. Borderloin's testimony regarding LP & L's policy, or lack thereof, regarding locating downed power lines. Both Mr. Borderloin and Mr. Carpenter stated that, had the wire been "solidly grounded," it could have been touched without danger of electrocution. Each witness admitted, however, that this wire was obviously not "solidly grounded."
As part of its case in chief, the City offered the testimony of Rick Brooks, an electrical engineer. The exclusion of Mr. Brooks' testimony is at issue in this appeal and will be discussed, infra, under the appropriate assignment. We will, however, outline his testimony here.
Mr. Brooks had previously provided opinions to LP & L in this case, but had been released when LP & L was dismissed from the suit. Thereafter, the City retained Mr. Brooks and called him to testify at trial. The trial court accepted Mr. Brooks as an expert in electrical engineering and safety and as the only expert to testify at trial. Mr. Brooks testified that the power line fell to the ground as a result of a lightning strike. He also testified that lightning arresters, if placed on the line, bleed off any electrical charge from the lightning. Mr. Brooks testified that the lightning arresters described by Mr. Borderloin and Mr. Carpenter were on the 13,800 volt portion of the system, not on the 2,400 volt portion which was the portion involved in this accident. There were, however, two lightning arresters on the 2,400 volt portion, one on each of the outside of the three lines. The center line, which is the one that fell and electrocuted Jed, did not have a lightning arrester in place. In Mr. Brooks' opinion, had the line been equipped with a lightning arrester, it would not have failed and fallen to the ground. Mr. Brooks further testified that the Delta System employed at this site is archaic; 95 percent of the electricity is now distributed via "grounded systems."
Finally, Mr. Brooks testified regarding the propriety of the conclusions drawn by the City employees who inspected the downed line. Mr. Brooks opined that Mr. Battaglia's conclusion that the line was grounded and, therefore, dead, was reasonable. He also testified that it was unreasonable and unsafe for any person without training to attempt to handle a power line hanging from a pole. In Mr. Brooks' opinion, a power line lying across a metal railing presented no immediate danger, but, if moved, could present a danger.
After Mr. Brooks completed his testimony, the trial court reversed its earlier decision to allow the expert's testimony and struck the testimony in its entirety. The basis for its ruling was that Mr. Brooks had previously been retained by LP & L and was now being offered as a witness for the City which, in the trial court's opinion, constituted a conflict of interest. The City was allowed, however, to proffer the testimony of Mr. Brooks.
Several witnesses, including Jed's sister, parents and grandfather, testified at trial regarding the close relationship between Jed and his family and the devastating effect his death had on various members of his family and the community.
At the conclusion of the trial, the trial court found the City 100 percent at fault in the accident which killed Jed, assigning no third party or victim fault. As previously stated, the trial court then awarded the sum of $709,958.55 in damages to the Dartlones.

DISCUSSION
In order to determine whether liability exists under the facts of a particular case, the supreme court has adopted a duty-risk analysis. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). The plaintiff must prove that the defendant's conduct was a cause-in-fact of the *785 plaintiff's harm; that the defendant owed a duty of care to protect against the risk involved; that the defendant breached the duty; and that actual damages resulted from that breach. Id. The first inquiry is cause-in-fact. Although not strenuously argued in this appeal, we find that, but for the City employees' failure to remain with the line and failure to report the downed line, Jed's unfortunate accident probably would not have occurred.

Assignments of Error Nos. 1 & 3: Duty and Statutory Immunity
We now address whether the City owed, or assumed, a duty to Jed under the facts of this case, in the absence of which, no liability can result. Based on the actions of the City employees in this case, we find that the City assumed the duty to protect citizens, such as Jed, from the downed power line.
Duty is a question of law. Generally, as the City points out, there is no duty to protect others from harm. When a duty to protect others against a particular harm has been assumed, however, liability may be created by a negligent breach of that duty. Restatement of Torts Second, Sec. 324(A); Harris, supra; Thompson v. Hodge, 577 So.2d 1172 (La. App. 2d Cir.1991). In Harris, supra, our supreme court held that where a business undertakes to hire a security guard to protect itself and its patrons, that business is liable for physical harm which occurs because of the negligence on the part of that guard. The supreme court in Harris explained that the guard was there to "prevent financial loss to the restaurant, assure the patrons that the premises were safe, and otherwise create what turned out to be an illusory impression of security." The supreme court further opined that it was unnecessary to explore the question of the restaurant's duty to hire the guard initially because Pizza Hut had obviously "recognized the risk" of crime occurring on the premises; and, having accepted the duty of hiring a guard, the critical question was whether the guard discharged his duty in a reasonable and prudent manner.
Similarly, in Barnes v. Bott, 571 So.2d 183 (La.App. 4th Cir.1990), writ denied, 573 So.2d 1141 (La.1991), the fourth circuit found a duty of protection on the part of a school board where it accepted, actively participated in and supported a school crossing guard program instituted by the City. By so doing, the court found that the school board voluntarily assumed the duty of verifying that the crossing guard would be present at designated intersections during her normal duty hours. The third circuit reached a similar conclusion in Carlin v. Rapides Parish Police Jury, 584 So.2d 337 (La.App. 3d Cir.1991). Carlin involved work performed by the police jury on a bridge over which the police jury had no custody or control. As such, the police jury had no legal duty to perform the maintenance work. The police jury, however, voluntarily undertook to perform the work on the bridge which, according to the court, created an assumed duty to carry out the work in a reasonably prudent fashion. See also Schulker v. Roberson, 91-1228 (La.App. 3d Cir.6/5/96), 676 So.2d 684; Crane v. Exxon Corp., USA, 613 So.2d 214 (La.App. 1st Cir.1992), opinion on remand, 633 So.2d 636 (La.App. 1st Cir.1993).
In the case sub judice, the trial court specifically stated:
The city employees and representatives became aware of the potentially deadly situation. They assumed the position of being responsible for the downed line... According to the testimony of the city employees, they not only recognized the danger, but they stated that they would remain and protect the situation until Entergy representatives arrived to correct and restore the area to safety. They even stated that they would notify Entergy of the situation, but the record establishes that they did not do so.
We agree with this portion of the trial court's ruling. The record clearly indicates *786 that no less than four City employees were aware of the downed line. First, Mr. Rowell assumed responsibility for the situation when he inspected the line, was unsure of its origin and directed' two electricians, Mr. Battaglia and Mr. Sloan, to inspect the line and report their findings. Next, Mr. Battaglia, who was aware of the potential danger of a live downed power line, assumed responsibility for the situation when he radioed Mr. Wright and informed him that he and Mr. Sloan would remain with the line until LP & L arrived. We note that, at that point, both Mr. Sloan and Mr. Wright were also aware of the potentially dangerous situation with the power line. We find, therefore, that the City, through these employees, was aware of the dangerous situation and gratuitously or voluntarily assumed the responsibility of investigating and protecting the public until the situation could be reported and repaired.[4]
Next, we find that the City was not protected by any statutory immunity. The City argues that it is entitled to immunity under both La. R.S. 9:2798.1 and La. R.S. 9:2793. To the extent the Dartlones rely on discretionary acts or omissions of City employees committed in their official capacities, the City contends that La. R.S. 9:2798.1 should apply. The City, however, fails to acknowledge the well-established rule of law which provides that such immunity is only afforded to those governmental actions which are based on articulated social, economic or policy considerations. Hardy v. Bowie, 98-CC-2821 (La.9/8/99), 744 So.2d 606. Since the City did not articulate any such considerations for not protecting the public from or reporting the downed line, we find that the trial court was correct in not applying the doctrine of statutory immunity under La. R.S. 9:2798.1.
We further find the City's reliance on La. R.S. 9:2793, which operates to protect persons who perform gratuitous services at the scene of an emergency, to be misplaced. That statute is designed to protect individuals who actually render aid to an injured person in an emergency situation, which is not the situation presented in this case. Furthermore, any immunity afforded to the individual under the statute does not inure to the benefit of the individual's employer. La. R.S. 9:2793(B).

Assignment of Error No. 4: Exclusion of Testimony of Rick Brooks
We will address this assignment at this juncture because the testimony of Mr. *787 Brooks plays an integral part in subsequent issues in this appeal. As previously stated, after initially allowing the testimony of Mr. Brooks and finding no conflict from his prior association with LP & L, the trial court reversed itself and struck Mr. Brooks' testimony in its entirety. The City challenges the trial court's conclusion that, because Mr. Brooks had been previously retained by LP & L, there was a conflict of interest which prohibited him from testifying on behalf of the City. We agree with the City.
Mr. Brooks stated to the trial court that his testifying was not in violation of his profession's ethical standards because LP & L released him, thereby allowing him to testify on behalf of the City. This explanation, however, was not acceptable to the trial court. As the City correctly points out, opinions of Mr. Brooks were the same throughout his involvement with the case; and, in many other contexts, one party may hire an expert witness who is not called to testify by that party, but who is then called by the adverse partywhich represents no conflict.
We also believe that the trial court's analogy to an attorney's ethical obligations was misplaced. An expert is not a party or a party's representative and there is no presumption that an expert is adverse or hostile to anyone. As such, an expert's testimony may be considered by the court in its search for the truth. Savoie v. Deere & Company, 528 So.2d 724 (La.App. 1st Cir.1988), writ denied, 532 So.2d 177 (La.1988). Provided Mr. Brooks' testimony meets the requirements of La. C.E. art. 702[5], which we find it clearly does, it was improper to exclude his testimony on the basis of such perceived conflict of interest. We further find that Mr. Brooks' testimony was vital to several defenses asserted by the City; and, therefore, its exclusion was extremely prejudicial. Since we find that the trial court erred in excluding the testimony of Mr. Brooks, we will consider such testimony in our discussion of the remaining issues on appeal.[6]

Assignment of Error No. 3: Breach
The City strenuously argues that, even if it did assume a duty to protect persons from the downed line, it discharged that duty in a reasonably prudent manner. In particular, the City contends that Mr. Rowell's and Mr. Battaglia's actions, after inspecting the line, were reasonable under the circumstances and, therefore, give no rise to liability. We disagree.
A duty of protection which has been assumed must be performed with due care. Harris, supra; Crane, supra; Carlin, supra; Barnes, supra. To create liability, the breach must be negligent, .substandard or blameworthy. Harris, supra; Thompson, supra. The question of breach is a factual one and, therefore, is subject to the manifest error/clearly wrong standard of review. Boykin v. Louisiana Transit Company, 96-1932 (La.3/4/98), 707 So.2d 1225; Thompson, supra.
The inquiry here is whether the trial court was clearly wrong in finding that the employees did not act with reasonable care in preventing the harm which occurred.
*788 In its reasons for ruling, the trial court stated:
[The City employees] could have remained, they could have blocked the area off, they could have blocked the entrance into the area until it was known that it was safe, or they could have done any number of things that was incumbent upon them under the law to protect the public or individuals from entering this area that they knew was possibly or probably a death trap for any one doing so.
We agree with the trial court that any one of these actions, including reporting the downed line to LP & L, would have been reasonable under the circumstances of this case. As previously stated, however, none of the four City employees who were aware of this danger took any action whatsoever to secure this area, warn the public or report the line to LP & L. The City maintains that Mr. Battaglia's actions were reasonable; and, based on his level of experience with high voltage lines, it was reasonable for him to conclude the line was dead since it was lying on a metal railing. According to the City, based on that reasonable conclusion, it follows that Mr. Battaglia's decision to leave the line unattended was also reasonable. We find, however, that the majority of the evidence supports the contrary conclusion.
Initially, we note that both Mr. Borderloin and Mr. Carpenter testified that, if one of the three lines in the Delta System was to fall, it would remain live unless it was "solidly grounded." Mr. Brooks testified that, in order to be "solidly grounded," the line should be clamped or secured to the metal surface. The wire was not in any way secured to the metal railing. The only question was whether or not the line was lying on a painted or rusted portion of the railing. Furthermore, even if the line was temporarily grounded by the metal railing, Mr. Brooks admitted that, once the grounding was broken by movement of the wire separating it from the railing, the wire would allow the flow of fatal electrical charges. The record reveals that Mr. Rowell, Mr. Battaglia and Mr. Sloan also appreciated the dangers of a live power line.
Mr. Rowell inspected the line and was uncertain as to its origin or whether or not it was energized. We find it significant that both Mr. Battaglia and Mr. Sloan noticed that one of the three power lines in the Delta System was missing, or had fallen, when they drove up to the site of the downed line. When he noticed one of the lines was down, Mr. Battaglia radioed Mr. Wright and informed him that he did not know whether the line was energized and was concerned enough about the potential dangers that he was going to remain with the line until LP & L arrived. On closer inspection, Mr. Battaglia concluded that the line was dead because it was lying across the metal railing. Mr. Battaglia admitted in his testimony, however, that he was not certain enough of this conclusion to touch the line, but was confident enough to leave the line unattended and return to the water treatment facility. Significantly, Mr. Battaglia did not radio Mr. Wright to inform him that he had changed his mind and decided not to remain with the line, nor did he call LP & L to report the line. Mr. Sloan testified that, out of respect for electricity, he did not even exit the truck. Based on Mr. Battaglia's observations, Mr. Sloan assumed the line was dead, but admitted that he would not have touched it. Both admitted that they knew the cardinal rule of high voltage lines was never to assume that a line was dead without checking behind the line, yet neither Mr. Battaglia nor Mr. Sloan checked behind this line to ensure that it was not energized.
We find that this record contains ample evidence to support the trial court's finding that the City negligently breached its assumed duty to Jed. Such finding was not manifestly erroneous or clearly wrong.

*789 Assignment of Error No. 5: Allocation of Fault

In this assignment, the City challenges the trial court's assessment of fault, arguing that finding the City 100 percent at fault in the accident was clearly wrong. First, the City submits that Jed's employer, the Tensas Levee District, was at fault by virtue of the failure of Jed's supervisor, W.T. Riles, to provide instructions to the boys regarding the danger of working around power lines. Second, the City submits that LP & L was clearly at fault in this accident. LP & L owned all of the equipment involved, was aware that a lightning strike had occurred in the area the day prior to the accident, did not have a lightning arrester in place on the line that fell and ultimately killed Jed and did not have any policy whatsoever for locating downed power lines such as this one. Finally, the City maintains that a portion of the fault must be assessed to Jed. It argues that the actions of a reasonable person would not include picking up a downed power line.
First, we find nothing in the record which merits a finding of liability on the part of Jed's employer, the Tensas Levee District. Likewise, regarding victim fault, we find no error in the trial court's finding that Jed was free from fault in this accident. The record reveals that the line was hanging straight down the pole from which it fell and meandered into the tall grass. The point at which Jed reached down to pick up the line was approximately 20 feet from the pole. Several witnesses testified that the line was not insulated like one would expect of a power line. Instead, the testimony revealed that the line, as Jed must have appreciated it, was simply a bare silver wire in the grass. We do not find fault in this 17-year-old boy's reaching down to move the wire.
Regarding the fault of LP & L, however, we reach a different conclusion. The record clearly indicates that LP & L was partially at fault in causing this accident. As previously stated, LP & L owned all of the equipment involved in this accident; and, significantly, the line which fell was just over the fence of one of LP & L's substations. While there were lightning arresters in place on the 13,800 volt lines leading to the 2,400 volt Delta System, and on the two outside lines of the three phase Delta System, there was no arrester in place on the line which fell and ultimately resulted in Jed's death. Mr. Brooks testified that it is the safer practice to have such arresters on all lines; and, had there been a lightning arrester on this line, it would not have failed and fallen. Furthermore, Mr. Borderloin testified that LP & L's lightning tracking system indicated that a lightning strike had occurred in the area of this downed line the day before the accident. LP & L, however, has no policy providing for locating such downed lines; rather, it relies on customers and passers-by to notice the downed lines and report them. Despite the testimony that the lightning tracking system is not a tool utilized to pinpoint equipment that is damaged by lightning strikes, we find that LP & L's total indifference regarding the potentially deadly consequences of allowing fallen power lines to remain down until, by chance, someone notices and makes the call to report it to be a breach of its duty to the public regarding the safe operation of its electricity distribution system. We further find that the failure of LP & L to place a lightning arrester on this line or to follow up on the indication of a lightning strike in the area were substantial causes of the accident which killed Jed. Based on this record, we find that the trial court abused its discretion in assessing 100 percent fault to the City. We further find the proper allocation of fault in this case is 50 percent fault on the part of the City and 50 percent fault of LP & L.

Assignment of Error No. 6: Quantum
The City does not challenge the overwhelming evidence of the closeness of the *790 Dartlone family and the devastating effect Jed's death had on his family. The City does contend, however, that the trial court's award of $350,000 per parent is abusively high, even for the loss of such an outstanding son, and that the highest affirmable amount in this case is $150,000 per parent.
An award of monetary damages may not be disturbed absent an abuse of discretion. Smith v. Midland Risk Insurance Company, 29,793 (La.App.2d Cir.9/24/97), 699 So.2d 1192. The appellate court's function is not to determine whether a different damage award may have been appropriate, but whether the trial court's award is reasonably supported by the record and justifiable inferences from the record. Summarell v. Ross, 27,160 (La.App.2d Cir.8/23/95), 660 So.2d 112. Only after an abuse of discretion is shown may a reviewing court resort to prior awards in similar cases. Reichert v. State, Through the Department of Transportation, 96-1419 (La.5/20/97), 694 So.2d 193.
On this record, we do not find an abuse of discretion in the trial court's award of $350,000 per parent in wrongful death damages. Jed Dartlone was, by all accounts, an exemplary young man, student, son and member of the community. Jed's grandfather testified that Jed and his father did everything together; Jed was the only son and the two hunted, fished, worked on Jed's truck and enjoyed a very close relationship. Since Jed's death, Mr. Dartlone has sought therapy and been prescribed medication for depression. Mr. Dartlone testified that Jed's death has impacted every aspect of his life, including his ability to perform his job as a child protection supervisor in Richland and West Carroll Parishes. He visits Jed's gravesite twice per week. Likewise, Mrs. Dartlone prayed for a son when Jed was conceived and thought of Jed as a gift from God. Jed was a "mama's boy" and was extremely close to his mother. Jed's death devastated Mrs. Dartlone. She lost a significant amount of weight and was prescribed several medications for depression and to help her sleep. Her mental state following Jed's death precipitated her resigning from her job.
A trial judge has much discretion in awarding damages for loss of love, affection and support. The loss of a child cannot be expressed easily in mathematical terms. A review of the jurisprudence reveals similar awards in situations where the evidence concerning the loving relationship between a teen-aged child and each of his or her parents is overwhelming.[7] While we acknowledge that the award in this particular case represents the high end of wrongful death awards in such cases, we cannot say that the trial court abused its wide discretion in concluding that the sum of $350,000 per parent was appropriate in this case.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to reflect an allocation of fault of 50 percent to the City of Monroe and 50 percent to LP & L. The *791 wrongful death damage award of $350,000 per parent is affirmed; but the total amount of damages payable by the City to Plaintiffs, $709,958.55, representing wrongful death damages and special damages, shall be reduced by 50 percent, representing the portion allocated to LP & L. Costs are assessed to the City of Monroe.
AMENDED AND, AS AMENDED, AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, PEATROSS, KOSTELKA, and DREW, JJ.
Rehearing denied.
NOTES
[1] The electricity distribution system involved in this case was a 2,400 volt Delta System, which is not grounded, meaning that it has no reference to the ground. The Delta System consists of three phases, or wires, that carry electricity.
[2] Lightning arresters are devices utilized to protect LP & L's equipment. The device is placed on the conductor and is intended to arrest the lightning, or bleed the lightning charge off of the line into the earth, so that the equipment is not affected by the lightning strike.
[3] The testimony regarding the prior splicing of this particular line was apparently offered to show that the line had been separated, or broken, before and was not as strong as a line which has never been spliced and repaired.
[4] The City argues that the trial court was clearly wrong in finding that the City owed a duty to Jed. It is the position of the City that, since the property on which the accident occurred was not owned by the City and since the employees of the City who were involved were all assigned to the nearby, but totally separate, water treatment facility, the actions of such employees should be viewed as actions of any other private citizen(s) who may become aware of a downed power line. The City contends that the employees in this case should be viewed as private citizens and argues that private citizens are under an obligation not to hurt another person; however, private citizens have no duty to help or confer a benefit upon other private citizens. The City maintains that no City employee was acting with any official responsibility regarding the downed power line. We disagree.

Significantly, this particular line serviced the City's pumping facility. Mr. Rowell, the first City employee to inspect the line, testified that part of his reasoning in sending Mr. Battaglia and Mr. Sloan to inspect the line was to determine if it was, in fact, running to the pumping station, which Mr. Rowell considered to be the business of the City. Mr. Battaglia's and Mr. Sloan's inspections of the line were at the direction of Mr. Rowell, their supervisor. Mr. Massey later testified that it was City policy to call LP & L upon noticing a downed line which services the City's facility. Based on this evidence, we find that the City employees involved were acting on behalf of the City in investigating and inspecting this line; and, therefore, their actions are imputable to the City for purposes of liability.
The parties also engage in argument regarding the propriety and applicability of the "public duty doctrine" in this case. Since, however, we find that the City clearly assumed a duty in this case, we pretermit any discussion on the existence of an independent duty flowing from the City to Jed under this theory.
[5] La. C.E. art. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
[6] As an additional basis for exclusion of Mr. Brooks' testimony, the Dartlones submit that the City never disclosed, through discovery, that it had retained an expert witness, despite the fact that several sets of interrogatories were propounded to it. The Dartlones further point out that the City's answers to those interrogatories were never supplemented. We note, however, that Mr. Brooks was listed on the City's amended pretrial statement which was filed within the appropriate time delays. As such, we find that counsel for the Dartlones was aware, prior to trial, that the City intended to call Mr. Brooks to testify. This argument is without merit.
[7] See Gladney v. Sneed, 32,107 (La.App.2d Cir.8/18/99), 742 So.2d 642, writ denied, 753 So.2d 215 (La.2000) (award of $315,000 to father for wrongful death of 25-year-old daughter was not abuse of discretion); Bryant v. Solomon, 97-2008 (La.App. 4th Cir.3/25/98), 712 So.2d 145 (affirming an award of $300,000 to one parent for the wrongful death of an adult daughter); Owens v. Concordia Electric Cooperative, Inc., 95-1255 (La.App. 3d Cir.6/25/97), 699 So.2d 434, writs denied, 97-2698, 97-2730 (La.1/9/98), 705 So.2d 1113 (court of appeal reduced trial court's award of damages from $1,000,000 per parent to $350,000 per parent for loss of 16-year-old son); Hasha v. Calcasieu Parish Police Jury, 94-705 (La.App. 3d Cir.2/15/95), 651 So.2d 865, writs denied, 95-0667, 95-0676 (La.4/28/95), 653 So.2d 592 (award of $325,000 per parent for loss of 18-year-old son was not manifestly erroneous); In re Medical Review Panel Bilello, 621 So.2d 6 (La. App. 4th Cir.1993), writ denied, 629 So.2d 1139 (La.1993) (award of $450,000 to mother for loss of 14-year-old son was not abuse of discretion).